

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 2 8 2022

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

|  |  |
|---|---|
| ERIC GREATHOUSE, ERNESTO COVARRUBIAS, TIFFANY SUMRALL and BARBARA MYLES, individually and on behalf of all others similarly situated, | Case No. 4:21-cv-1243-BRW **AMENDED CLASS ACTION COMPLAINT** |
| Plaintiff, | <u>JURY TRIAL DEMANDED</u> |
| v. |  |
| CAPITAL PLUS FINANCIAL, LLC and CROSSROADS SYSTEMS, INC., |  |
| Defendants. |  |

Plaintiffs Eric Greathouse ("Greathouse"), Ernesto Covarrubias ("Covarrubias"), Tiffany

Sumrall ("Sumrall") and Barbara Myles ("Myles") (collectively, "Plaintiffs"), individually and

on behalf of all others similarly situated, file this Amended Class Action Complaint for damages,

an accounting, and equitable relief against Capital Plus Financial, LLC ("CPF") and CPF's

corporate parent, Crossroads Systems, Inc. ("Crossroads" and, together with CPF,

"Defendants"), for failure to fund U.S. Small Business Association (the "SBA")-approved

Paycheck Protection Program ("PPP" or the "Program") loans that CPF was contractually

obligated to fund. In support, Plaintiffs make the following allegations based upon information

and belief except as to the allegations pertaining to themselves which are based on personal

knowledge. Plaintiffs' information and belief is based on the ongoing investigation of their

counsel which included, among other things, a review of applicable documents, information

from other litigation against Defendants and one of Defendants' senior executives, publicly

available information concerning the PPP and PPP loans, filings with the U.S. Securities and Exchange Commission (the "SEC"), and media and other reports available on the Internet.

## **Summary of the Claims**

1.      Following the worldwide outbreak of COVID-19, Congress passed the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") to, among other things, provide some relief to America's small businesses and sole proprietors through the creation of the PPP.

2.      Administered by the United States Small Business Administration ("SBA"), the PPP was established to provide hundreds of billions of dollars of potentially forgivable loans to small businesses and sole proprietors in a quick and efficient manner using the same standard form note and accompanying loan agreement documents that Plaintiffs and other PPP borrowers entered into with CPF.

3.      To ensure that small businesses and sole proprietors received PPP loan proceeds quickly, the applicable provisions of the PPP required lenders to fund PPP loans within ten days of SBA approval.

4.      Lenders that participated in the Program were entitled to fees payable by the SBA for each PPP loan the lenders processed.

5.      Defendant CPF was one of the SBA's authorized PPP lenders.

6.      Before the PPP, CPF was a small lender in the Texas area with less than $40 million in total revenue in fiscal year 2020.

7.      Defendant CPF is, or at all times relevant in 2021 was, defendant Crossroads's only operating subsidiary. Crossroads is a publicly-traded for-profit holding company. CPF is, and at all times relevant in 2021 was, controlled and dominated by Crossroads; shared certain of

2

the same senior executives; had a website that referenced and promoted Crossroads and provided links to Crossroads's website; was referred to in Crossroads's SEC filings and other public statements as one and the same company; and was operated by Crossroads as if they were one and the same company.

8.      In 2021, after the SBA substantially increased the fees lenders would receive for PPP loans made in 2021, Crossroads caused CPF to exploit that increased fee opportunity by dramatically ramping up its participation in PPP lending. It was hugely successful in that respect.

9.      In particular, CPF reportedly processed 472,036 PPP loans totaling over $7.5 billion through May 31, 2021 -- the second most PPP loans by any other lender in 2021, and more than the total number of PPP loans made in 2021 by Bank of America, PNC Bank, TD Bank and Wells Fargo *combined*. *See* Paycheck Protection Program (PPP) Report: Approvals through 05/31/2021, at p.7, available at https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf (last accessed Sept. 21, 2021).

10.     Although only CPF and not Crossroads was the SBA-qualified PPP lender, Crossroads was the alter ego of CPF, and thus CPF upstreamed all or the vast bulk of its PPP lending fees directly to Crossroads.

11.     Accordingly, in its SEC filings, *Crossroads* reported that "the Company" received $970.5 million in total revenue of which $930 million was PPP loan fees in 2021 compared to just $27.5 million in total revenue the prior year. As stated in *Crossroads's* quarterly report filed with the SEC for the period ending July 31, 2021:

> "Total revenue from operations for the nine months ended July 31, 2021, was $970.5 million compared to $27.5 million for the same period of 2020. The increase in revenue was the result of *the Company* participating in the Payment Protection Program (PPP) administered by the Small Business Administration ('SBA'). *The Company* earned fees from the program totaling approximately $930.0 million."

3

*See* http://www.crossroads.com/wp-content/uploads/2021/09/CRSS_Q3-2021-OTC-Disclosure-Statement.pdf (accessed Dec. 23, 2021) (emphasis added).

12.     In flagrant disregard of its contractual loan agreement obligations to Plaintiffs and the other eligible class member borrowers, however, CPF failed to actually fund those borrowers' SBA-approved PPP loans.

13.     Plaintiffs and numerous other business owners across the country each timely applied for PPP loans with CPF, had their loans approved by the SBA and assigned PPP loan numbers, and yet never received their PPP loan funds.

14.     For its role in controlling CPF and in directing the conduct and exploiting CPF's status as an SBA-approved PPP lender, Crossroads not only received hundreds of millions of dollars in PPP loan fees -- including loan fees on the backs of the PPP loans of Plaintiffs and other putative borrower members of the proposed class across the country that CPF failed to fund. It also, less than two months from when the PPP lending window closed on May 31, 2021, announced that as a result of its "windfall associated with the PPP loan program" it was "now overcapitalized" and would pay out a special dividend of $40 per share to shareholders of record as of July 19, 2021 totaling over $238 million, $157 million of which was rushed out and paid to the handful of senior executives and directors of Defendants who collectively then owned approximately 66% of Crossroads's equity.

15.     In sum, while purporting to "promote economic vitality and community development" and "'hav[ing] seen firsthand the impact that the pandemic has had on minority-owned businesses in low-to-moderate income tracts'" as Crossroads stated in its January 11, 2021 news release (*see* Capital Plus Financial Partners with Blueacorn to Expedite PPP Loan Relief to Small Businesses - Jan 11, 2021), Defendants and their senior executives shamelessly

4

enriched themselves off the backs of PPP loans to which Plaintiffs and other class member borrowers were contractually entitled but CPF failed to fund.

## Parties

16.     Plaintiff Greathouse, a natural person residing in Russellville, Arkansas, is a sole proprietor of an insurance inspection business.

17.     Plaintiff Covarrubias, a natural person residing in Santee, California, is a sole proprietor of an auto repair business.

18.     Plaintiff Sumrall, a natural person residing in El Paso, Texas, is a sole proprietor of a landscape architectural business.

19.     Plaintiff Myles, a natural person residing in Raeford, North Carolina, is a sole proprietor of a business involving independent artists, writers and performers.

20.     Defendant CPF is a limited liability company organized under the laws of the state of Texas with its principal place of business at 2247 Central Drive, Bedford, Texas 76021.

21.     Defendant Crossroads is a corporation organized under the laws of Delaware with its principal place of business at 4514 Cole Avenue, Suite 1600, Dallas, Texas 75205.

## Jurisdiction & Venue

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the aggregate amount in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states. This Court also has jurisdiction under the Class Action Fairness Act because at least one member of the proposed class is a citizen of a different state than defendant CPF; there are more than 100 members of the proposed class; and the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2)(A).

23.     Defendants' motion to dismiss contends that plaintiff Greathouse's initial complaint "fail[ed] to plead that Defendants' conduct relating to the claims he asserts in this case created any connection with Arkansas, and, indeed, *no such connection exists*." Dkt. 25 at ECF p. 8 (emphasis added). Defendants are incorrect because they have many connections here.

24.     As a threshold matter, Defendants premise their challenge to personal jurisdiction on a single self-serving declaration (ECF 24-1), and assert exclusively facts regarding what they did *outside* Arkansas. In doing so, Defendants would have the Court ignore entirely other *publicly available* facts they omit which clearly demonstrate, even at this pleading stage without the benefit of *any* discovery, that Defendants purposefully availed themselves of, and benefitted directly from, substantial business in Arkansas and this judicial District at all relevant times concerning the claims at issue.

25.     This Court has personal jurisdiction over defendant CPF because CPF had substantial and direct contacts in this District by virtue of its entering into its agreement to fund plaintiff Greathouse's PPP loan; by entering into PPP loan agreements with thousands of other PPP borrowers in this District; by committing to fund the PPP loans under the contractual loan agreements it entered into with plaintiff Greathouse and other PPP borrowers in this District; by its loan and borrower review and underwriting activities Defendants *admit* accompanied, and were a part of, each such PPP loan, including the thousands of loans to borrowers in this District; by its obtaining PPP lender fees from PPP loans committed to borrowers in Arkansas and this District; by virtue of ongoing PPP loan advance reporting requirements to the SBA *directly in* this District concerning the PPP loans of borrowers *not only* in this District and Arkansas, *but also* borrowers from *23 other* states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands; and by virtue of its communications and activities it undertook in this District

with the SBA relating to many of the PPP loans, PPP loan forgiveness, interest on PPP loans and PPP loan fees at issue in this case.

26.     More particularly, and for further detail, although Defendants' motion to dismiss implies it did business in this District only with plaintiff Greathouse, CPF in fact committed to fund at least 2,134 separate SBA-approved PPP loans in 2021 for qualified borrowers residing in this District alone, for total PPP loan proceeds of at least $32,770,618.00 according to the SBA's own publicly-available PPP loan data. *See* website https://data.sba.gov/dataset/ppp-foia (public_up_to_150k_1_220102.csv). In addition, and also based on the SBA's publicly available SBA PPP loan data, CPF committed to fund at least 2,578 separate SBA-approved PPP loans in 2021 for qualified borrowers residing in the State of Arkansas, for total PPP loan proceeds of at least $38,715,478.00. *Id.*

27.     Assuming that each such PPP loan generated PPP loan processing fees of *at least* $2,500.00 per loan, this means that CPF obtained at least $5,335,000.00 in total PPP loan fees on the backs of resident business owners located directly in this District (2,134 x $2,500.00), and $6,895,000.00 in total PPP loan fees from loans to resident business owners in Arkansas (2,578 x $2,500.00).

28.     In connection with each of the thousands of PPP loan agreements and millions of dollars in lender processing fees with borrowers in this District, CPF purposefully availed itself of substantial and direct business activity in this District sufficient to subject itself to the personal jurisdiction of this Court. In fact, for each such PPP loan, CPF's role was not limited to entering into the loan agreement contracts and funding the loans for Plaintiffs and other putative class member borrowers.

29.     In addition, CPF's role as the SBA-approved lender of PPP loans required it to underwrite and review each PPP loan individually, wherever the borrower was located. Defendants even admit that CPF had to review each such loan and apply its underwriting requirements to each such loan. *See, e.g.,* ECF 25 at ECF p. 16 ("CPF's role in PPP lending is thus limited to *applying its own internal underwriting requirements to loan applications* …, making a decision of whether to fund loan, and then ultimately funding the loan if appropriate.") (emphasis added). Similarly, in other currently pending litigation involving a claim that Defendants failed to share PPP lender processing fees with one of its agents, Defendants stated the following regarding CPF's underwriting obligations as to each PPP loan:

> "The lender, however, must do some basic 'underwriting.' Specifically, the PPP Regulations contain a section titled, "What do lenders have to do in terms of loan underwriting?" [86 Fed. Reg.] at 3707–08. The regulations enumerate four 'underwriting' steps:
>
> (1)     confirm receipt of the borrower certifications in the Form 2483 application;
>
> (2)     confirm receipt of documentation showing employment status of the applicant or if a business, documents showing employees as of February 2020;
>
> (3)     confirm the historic payroll (if the applicant had employees) by examining the documentation submitted; and
>
> (4)     comply with the Bank Secrecy Act ("BSA") or similar anti-money laundering procedures, such as a customer identification program ("COP"), designed to make sure the lender confirms the identity of the applicant.
>
> *Id.* In addition to the above steps, the lender was obligated to 'review' each application. *Id.* at 3708 ('Each lender's underwriting obligation under the PPP is limited to the items above and reviewing the 'Paycheck Protection Borrower Application Form.')."

Quoting Defendants' Memorandum of Law in *Oto Analytics, Inc. d/b/a Womply v. Capital Plus Financial, LLC, et al.,* Case No. 3:21-cv-2636-B (N.D. Tex.) (ECF 43 at ECF pp's 9-10).

30.     Further, Defendants' attempt to argue that they outsourced and relied on third-party PPP agent firms and thereby were distanced from actively undertaking its own underwriting and review obligations (*see* ECF 25 at ECF pp's. 15-16), is contradicted by Crossroads's own statements to shareholders in describing its involvement in PPP. For example, in a letter accompanying Crossroads's report to shareholders for the three months ended April 30, 2021, Crossroads's Chairman Robert Alpert and Crossroads's and CPF's then dual CEO and Crossroads Board member Eric Donnelly stated that "[t]hough we leaned heavily on our loan service providers for support on the front end, *we were thorough in reviewing applications on the back end.* Whereas most lenders use one to two layers of identity verification and customer compliance mechanisms, we used four. This investment in KYC ('knowing your customers') substantially reduced fraud, which is evidenced by a negligible rate of active fraud cases of less than .25bps." (emphasis added).

31.     This Court has personal jurisdiction over defendant CPF by virtue of the underwriting and review process that CPF necessarily had to do as to each PPP borrower in this District, including but not limited to plaintiff Greathouse and the thousands of additional PPP borrowers in this District.

32.     The Court also has personal jurisdiction over defendant CPF also by virtue of CPF's substantial and direct connections to, and communications and activities regarding PPP lending with, the SBA Commercial Loan Service Center *located directly in this District* -- some *three miles from this Court and the offices of one of Defendants' counsel.*

33.     Again although omitted from Defendants' motion to dismiss, the SBA has two Commercial Loan Service Centers in the United States that service all of the SBA's commercial loans, one in Fresno, California that services business primarily in the western half of the United

States, and the other *actually located in Little Rock, Arkansas* at 2120 Riverfront Drive, that

services business primarily in the eastern half of the United States. *See*

https://www.sba.gov/LittleRockCLSC. The SBA's Little Rock Commercial Loan Service Center

"was created in 1995 to centralize the servicing of SBA's 7(a), 504 Debenture and Disaster

Business loans for Regions 1-4 (Eastern Seaboard) and most of Region 6 (Central Southern

States Oklahoma and Texas)"; "covers 24 states, the District of Columbia as well as Puerto Rico

and the US Virgin Islands"; and "is one of two Centers nationwide that *handles all of SBA's*

*commercial loans*." *See* https://www.sba.gov/content/mission-clsc-ar (emphasis added).

    34.    The SBA's Little Rock Commercial Loan Service Center *includes Texas-based*

*qualified PPP and other SBA-approved lenders including CPF. See*

https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20091%20-

%202nd%20Updated%20PPP%20Processing%20Fee%20and%201502%20Reporting-508.pdf at

6 n. 4 ("The geographic coverage of the Fresno Servicing Center is SBA Regions 5, 6 (except for

Arkansas, Oklahoma and Texas) 7, 8, 9, and 10. The geographic coverage of the Little Rock

Servicing Center is SBA Regions 1, 2, 3, 4, and 6 (except New Mexico and Louisiana)."

    35.    PPP and PPP lending was part of the SBA's commercial loan servicing. In

connection with the PPP and PPP lending, CPF engaged in substantial and direct

communications with personnel in the SBA's Little Rock Commercial Loan Service Center

regarding PPP loan applicants, SBA-approved borrowers including Plaintiffs and the other

putative members of the proposed class, PPP lender fees and other aspects of the PPP. The SBA

even directed that questions relating to aspects of PPP lending should be made to either of the

two Service Centers. *See, e.g.,* https://www.sba.gov/sites/default/files/2021-

02/Procedural%20Notice%205000-20091%20-

%202nd%20Updated%20PPP%20Processing%20Fee%20and%201502%20Reporting-508.pdf at

p. 6 ("Questions on voluntary termination can be emailed to: For the Fresno Servicing Center: fsc.servicing@sba.gov; for the Little Rock Servicing Center: lrsc.servicing@sba.gov.").

36.    CPF accordingly communicated substantially and directly with personnel from the Little Rock Commercial Loan Service Center not only in connection with the PPP loans of plaintiff Greathouse and other SBA PPP borrowers residing directly *in* this District, but also in connection with PPP borrowers from the additional 23 states and other territories within the SBA's Little Rock Commercial Loan Service Center coverage areas -- which, collectively, represents many thousands of additional SBA-approved borrowers, including Plaintiffs and numerous other similarly situated SBA-approved but unfunded borrowers of the proposed class.

37.    Although these facts demonstrate that CPF has sufficient contacts in this District relating to the PPP lending at issue, jurisdictional discovery regarding CPF's and likely both Defendants' direct dealings and communications with borrowers in this District and with the SBA Little Rock Servicing Center and the lender processing fees CPF generated thereby will provide additional evidence regarding the substantial and direct business Defendants did at all relevant times in this District.[1]

---

[1]    Defendants moved on February 25, 2022 to basically stay discovery under the guise of extending the Court's scheduling deadlines pending the Court's ruling on their motion to dismiss, premised largely on their false contention that this Court lacks jurisdiction. *See* ECF 26, 27. The Court granted that motion by Order on March 2, 2022. *See* ECF 30. If the Court has any doubt it may properly exercise personal jurisdiction over both Defendants, Plaintiffs request they be permitted to take jurisdictional discovery concerning Defendants' contacts with the Little Rock Service Center regarding Plaintiffs' PPP loans and the PPP loans of other PPP applicants and borrowers within the Little Rock Service Center's coverage area; the total number of such applicants and borrowers of CPF and amounts of PPP proceeds and PPP lender processing fees at issue within that coverage area; the number of SBA-approved but unfunded class member PPP borrowers and total loan proceeds and the potential disposition by Defendants or whereabouts of those unfunded proceeds, including for unfunded borrowers in this District, Arkansas and other such borrowers within that coverage area; and the written and oral communications Defendants had with PPP borrowers in reviewing and underwriting PPP loan applications from borrowers in this District and the SBA coverage

38.     The Court has personal jurisdiction over defendant Crossroads because Crossroads controlled and directed CPF's conduct in PPP lending even though only CPF was the SBA-approved and qualified PPP lender; Crossroads directed CPF to, and CPF did, in fact, "upstream" to Crossroads the PPP loan processing fees CPF obtained from the PPP loans of Plaintiffs, class members and other borrowers as if Crossroads and CPF were one and the same company; Crossroads and CPF shared senior executives and overlapping websites that referred to each other; the shared executives of Crossroads and CPF participated directly or indirectly in the PPP lending process and in regularly communicating with personnel from the SBA's Little Rock Commercial Loan Service Center in connection with the PPP loans at issue; Crossroads's SEC disclosures and other statements referred to the companies as if they were one and the same; CPF was Crossroads's only operating subsidiary in 2021 and Crossroads was CPF's alter ego at all times relevant in connection with all aspects of PPP lending; and CPF's contacts in this District in connection with the claims at issue are also imputed to its corporate parent Crossroads.

39.     Venue is proper in this judicial District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## Additional Factual Allegations

### Background Concerning the
### COVID-19 Pandemic and the PPP

40.     On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a "pandemic." Two days later, on March 13, 2020, the United States declared a national emergency due to the COVID-19 pandemic.

---

area. Jurisdictional discovery will further support Plaintiffs' allegations that the Court's exercise of personal jurisdiction over both Defendants in this case is fair.

41.     In response, on March 27, 2020, the United States Congress passed the largest economic stimulus package in the nation's history -- the CARES Act. The CARES Act amounted to over $2 trillion in aid, equivalent to roughly $6,000 per American, or 45% of all federal government spending for 2019.

42.     The CARES Act was enacted to provide immediate assistance to individuals, families, and businesses affected by the COVID-19 emergency.

43.     One facet of the CARES Act's approach to economic relief was the PPP. Recognizing the huge strain that the COVID-19 pandemic would likely impose on American small businesses, the PPP initially allocated $349 billion for loans to small businesses, sole proprietors, and nonprofit organizations, among others. These loans were intended to pay up to eight weeks of payroll costs (including benefits) and could also be used to pay interest on mortgages, rent, and utilities.

44.     PPP loans are guaranteed by the SBA, and the PPP provides for loan forgiveness if the borrower demonstrates that the funds were used in compliance with PPP regulations.

45.     The PPP has received several legislative renewals, modifications, and extensions. On April 24, 2020, the President signed the Paycheck Protection Program and Health Care Enhancement Act, which provided additional funding and authority for the PPP. On June 5, 2020, the Paycheck Protection Program Flexibility Act of 2020 was enacted, extending the deferral period for PPP loans, among other provisions. On July 4, 2020, the PPP was further amended to guarantee PPP loans to August 8, 2020. On December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Economic Aid Act") was enacted, which further extended the PPP and allowed for the SBA to authorize second-draw PPP loans through March 31, 2021, available to borrowers who already used their previous PPP loan

proceeds for permitted expenditures. On March 11, 2021, the American Rescue Plan Act was signed into law, adding an additional $7.25 billion for PPP loans, bringing total appropriations for the program to $813.7 billion. Finally, on March 30, 2021, the PPP Extension Act was enacted, which extended the PPP application deadline to May 31, 2021, and gave the SBA until June 30, 2021 to process loan applications.

46.     PPP loans are generally available to businesses in operation as of February 15, 2020 that had paid employees, as well as self-employed individuals. Businesses receiving PPP loans cannot have more than 500 employees and cannot be in bankruptcy. Further, applicants are required to certify that the "current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Currently, at least 60% of the proceeds must be used for payroll costs. The entire amount of any PPP loan is subject to forgiveness so long as the proceeds are used for eligible expenses.

47.     Under the Economic Aid Act, a PPP borrower is entitled to a second draw under narrower conditions than its first draw. For example, a second draw borrower must have 300 or fewer employees, must demonstrate that it sustained a certain percentage reduction in its gross receipts compared to 2019, and must have used its entire first draw proceeds prior to disbursement of its second draw proceeds. Second draw loans -- like first draw loans -- are also subject to forgiveness.

48.     Given the anticipated volume of PPP loan applications, Congress provided for PPP loan processing and funding through private lenders, with the SBA paying these lenders a fee for each processed PPP loan.

49.     For their participation, the PPP originally provided that lenders would receive fees at a rate of five percent for loans $350,000.00 or less, three percent for loans between

$350,000.00 and $2,000,000.00, and one percent for loans over $2,000,000.00. *See* SBA

Procedural Notice, Control No. 5000-20091 (Feb. 8, 2021), available at

https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20091%20-
%202nd%20Updated%20PPP%20Processing%20Fee%20and%201502%20Reporting-508.pdf

(last accessed Sept. 17, 2021).

      50.     To address institutional lenders' neglecting of PPP loan applications from many

small businesses -- especially minority, underserved, veteran, and women-owned businesses -- in

favor of larger PPP loans, the Economic Aid Act added that lenders processing loans of up to

$50,000.00 would receive an increased fee of fifty percent or $2,500.00, whichever is less, per

PPP loan beginning December 27, 2020.

      51.     As the vast majority of PPP loans -- even those to the smallest businesses and sole

proprietors -- exceeded $5,000.00, PPP lenders received a flat fee of $2,500 for virtually every

PPP loan less than $50,000.00.

      52.     On February 8, 2021, the SBA issued a new notice setting forth the procedure for

how lenders would be paid PPP loan fees by the SBA. *Id.*

      53.     To apply for a PPP loan, a prospective borrower would have to submit a

standardized Borrower Application Form issued by the SBA (SBA Form 2483 for first time

borrowers and SBA Form 2483-SD for second draw borrowers), together with relevant payroll

documentation, to a lender. Once the lender reviewed and approved the loan application, the

lender would submit the application to the SBA for approval.

      54.     Following SBA approval of an application, the SBA would issue a ten-digit loan

identification number (known as a "GP [General Program] number") for the borrower's loan.

15

55. Provided that the borrower had executed the loan documents, the lender was required to disburse the PPP funds within ten days of SBA approval and assignment of the loan number.

56. If the PPP borrower did not sign and submit all of the required documents to the lender, then the PPP lender was required to report the loan and corresponding loan number as cancelled no later than twenty days from the SBA approval and assignment of the loan number.

57. Lenders' compliance with the above PPP funding requirement was of paramount importance to applicants and borrowers for reasons beyond their need to get the PPP loan proceeds in a timely manner.

58. Once the SBA approved a PPP loan and assigned it a loan number, the applicant could not apply for a PPP loan with any other lender because the applicant could not make all of the required certifications on another PPP loan application. Thus, once approved, the borrower was essentially "stuck" with the lender to whom it applied for the PPP loan, meaning that the borrower had to rely exclusively on the good faith of the lender to actually fund the loan.

59. For both first draw and second draw PPP loans, a PPP loan applicant had to certify that they had not and would not receive another first draw or second draw loan, respectively.

60. Since the lender's obligation to fund a PPP loan ran from the date the SBA approved and assigned a loan number, an applicant could not certify to another lender that they would not receive the first loan even if the first lender had failed to timely fund the loan.

61. Once a PPP loan was funded, the lender had ten days to submit an SBA Form 1502 to report to the SBA that the loan proceeds had been disbursed. After the lender submitted a Form 1502, the SBA would initiate payment of the processing fee to the lender.

16

62.     By submitting a Form 1502, the lender represented to the SBA that the PPP loan had been fully funded. Further, a lender was required to update the SBA with monthly Form 1502 reports detailing each PPP loan's status.

### Background Concerning Defendants

63.     CPF is a certified community development financial institution ("CDFI").

64.     CPF states on its website that it purports to "serv[e] the Hispanic community in the state of Texas." *See* http://www.crossroads.com/wp-content/uploads/2021/09/CRSS_Q3-2021-OTC-Disclosure-Statement.pdf (accessed Dec. 23, 2021).

65.     CDFIs were established as part of the Riegle Community Development and Regulatory Improvement Act of 1994. *See* What Are CDFIs, available at https://www.cdfifund.gov/sites/cdfi/files/documents/cdfi_infographic_v08a.pdf (last accessed Sept. 17, 2021). There are reportedly 1,000 CDFIs operating nationwide. *Id.*

66.     Although it is a CDFI, CPF was acquired by the for-profit, publicly-traded company Crossroads in 2017 (OTCQB: CRSS ).

67.     Crossroads states in media releases and on its website that it is a holding company that focuses on investing in businesses that promote economic vitality and community development. *See, e.g.*, https://capitalplusfin.com/in-the-news/.

68.     Since many sole proprietors' PPP loans were in amounts less than $10,000.00, PPP lenders were generating processing fees of only several hundred dollars for making those loans in 2020.

69.     Pursuant to the new 2021 increased fee schedule, however, lenders like CPF could count on collecting a $2,500.00 flat fee for every PPP loan less than $50,000.00.

70.     Taking into consideration the incredible demand for PPP loans less than $50,000.00 by sole proprietors, independent contractors, self-employed individuals and other underserved small businesses together with the more lucrative fee schedule, CPF and its corporate parent Crossroads saw an opportunity to generate enormous amounts of lender fees by booking a high volume of PPP loans under $50,000.00.

71.     CPF and/or Crossroads reportedly contracted with Blue Acorn PPP, LLC (and/or its affiliate, FinCap, Inc. or their affiliates) ("Blueacorn") in 2021 to help identify borrowers to whom CPF could make PPP loans and assist in the PPP paperwork process. Blueacorn reportedly, in turn, contracted with others such as Oto Analytics, Inc. d/b/a Womply ("Womply") to also help identify and assist additional potential PPP borrowers.

72.     Blueacorn was created in 2020. Neither Blueacorn or Womply is a bank or the SBA-qualified lender and, therefore, cannot actually make PPP loans.

73.     Defendants assert in their motion to dismiss that "CPF is committed to its borrowers' satisfaction and takes seriously any concerns that are raised about its services." ECF 25 at ECF p. 9. In truth, Defendants' PPP lending services have embroiled it not only in this litigation but also as noted above a separate lawsuit from its own direct or indirect partner, Womply, which alleges that both Defendants and one of their senior executives, Eric Donnelly ("Donnelly"), defrauded Womply out of its share of PPP lender processing fees and other payments. *See Oto Analytics, Inc. d/b/a Womply v. Capital Plus Financial, LLC, Crossroads Systems, Inc., Eric Donnelly, Ba Fin Orion, LLC d/b/a Blueacorn, and Barry Calhoun,* Case No. 3:21-cv-2636-B (N.D. Tex.). More specifically, Womply alleges that it referred 86,521 PPP loans to CPF totaling more than $950 million in total PPP loan proceeds that resulted in CPF

receiving $186,882,946 in lender processing fees, but that defendants there actually committed fraud and conspired in failing to pay Womply its share of those and other fees.

74.     In general, only SBA section 7(a)-approved lenders were approved to make PPP loans, together with any additional lenders determined by the Administrator of the SBA and the Secretary of the U.S. Treasury to also be qualified to make such loans. *See* 86 Fed. Reg. 3692 (Jan. 14, 2021), available at https://www.federalregister.gov/documents/2021/01/14/2021-00451/business-loan-program-temporary-changes-paycheck-protection-program-as-amended-by-economic-aid-act (last accessed Sept. 17, 2021).

75.     Accordingly, Plaintiffs and other similarly situated class member borrowers contracted with CPF as the lender obligated to make the PPP loans.

76.     For their role in identifying potential borrowers and helping with the PPP paperwork, Blueacorn, Womply and other PPP agent firms were reportedly entitled to a part of the lender's fees pursuant to their separate contractual relationships. *See* THE NEW YORK TIMES, How Two Start-Ups Reaped Billions in Fees on Small Business Relief Loans (June 27, 2021), available at https://www.nytimes.com/2021/06/27/business/ppp-relief-loans-blueacorn-womply.html (last accessed Sept. 17, 2021).

**Defendants' Exploit PPP Lending**

77.     Before becoming a PPP lender, Capital Plus was a small, regional lender whose total revenue from operations for the fiscal year ending October 31, 2020 was $36.6 million.

78.     At the direction and under the control of its corporate parent Crossroads, CPF exploited the increased fees to be paid by the SBA on smaller PPP loans in 2021 by reportedly agreeing to fund 472,036 PPP loans totaling over $7.5 billion in loan proceeds -- again the second highest number of loans by any lender in 2021, and more loans than Bank of America,

PNC Bank, TD Bank and Wells Fargo combined. *See* SBA, Paycheck Protection Program (PPP) Report, Approvals through 5/31/2021, p. 7, available at https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf (last accessed Sept. 17, 2021).

79.     As a result, *Crossroads* (not CPF) publicly reported that it "earned fees from the [PPP] totaling approximately $930 million" according to its quarterly report filed with the SEC for the period ending July 31, 2021. *See* http://www.crossroads.com/wp-content/uploads/2021/09/CRSS_Q3-2021-OTC-Disclosure-Statement.pdf (accessed Dec. 23, 2021).

80.     On June 14, 2021, Crossroads released its consolidated financial results for the second quarter of 2021, ending April 30, 2021. Crossroads disclosed that its "[g]ross origination fees associated with PPP loans totaled $464.1 million for the quarter," and that Crossroads "[e]xpects to accrue a total of $1.1 billion in deferred gross origination fees from the [PPP]." It also disclosed that as of April 30, 2021, Crossroads "held a cash balance of $213.1 million compared to $2.6 million as of October 31, 2020."

81.     The June 14, 2021 release of its financial results also states as follows (emphasis added):

> In the last several months, Capital Plus has transformed from a regional single-family mortgage-based lending institution into *one of the country's largest providers of small business loans*," said Eric A. Donnelly, Chief Executive Officer of Crossroads Systems. When the SBA announced its reopening of the program in January, we immediately identified strong synergies between the program's focus on small businesses and Capital Plus's core mission as a CDFI. Together with our loan service providers, we established early incumbency as the go-to institution for small business owners, independent contractors, and sole proprietors. Financially, our success in the program has put us into the *best position we have ever been in, netting us more than $150 million in operating income for the quarter*. *At a record cash position*, we are well-capitalized to support the future growth initiatives that will drive our double bottom line. We

will provide a more detailed review of the quarter and these growth initiatives in the near future upon the completion of PPP." (emphasis added).

82.     In a July 8, 2021 letter to Crossroads' shareholders, Donnelly again touted the success of its exploitation of PPP lending via its control and domination over its SBA-qualified PPP lending subsidiary CPF, stating as follows:

> "Within just five months, we have approved 472,036 loans at an average amount of $16,062. In total, this amounts to …. As a result of our early dominance in PPP lending, Capital Plus was ranked the fourth largest PPP lender by net dollar amount and the second largest by the number of loans approved."

83.     According to a July 2021 investor presentation, corporate insiders of Crossroads own (or then owned) approximately 66% of Crossroads' equity including specifically as follows: Robert Alpert ("Alpert"), Chairman of the Board of Crossroads and principal of 210/CRDS Investment LLC, 1,492,285 shares, or 25% of Crossroad's total outstanding shares; Donnelly, CEO and board member of Crossroads and also CEO of CPF until August 30, 2021, 2,255,677 shares, or 37.8% of Crossroad's total outstanding shares; and Farzana Giga ("Giga"), whose declaration Defendants filed with their motion to dismiss (ECF 24-1), CFO of both Crossroads and CPF and director of Crossroads, and Crossroads board members James Perez Foster, Claire Gogel, Ray Kembel and Clark C. Webb ("Webb"), 194,440 shares, or 3.3% of Crossroad's total outstanding shares. *See* http://www.crossroads.com/wp-content/uploads/2021/01/Crossroads-CRSS-Investor-Presentation_2021.pdf.

84.     Thus, in sum, the corporate insiders and directors of Crossroads owned 3,942,402 shares, or approximately 66%, of the 6,171,984 total outstanding shares as of July 2021, with Albert and Donnelly together owning approximately 62.8%. *Id.*

85.     On July 8, 2021 -- following its receipt of hundreds of millions of dollars in PPP loan fees, including for Plaintiffs and numerous other class member PPP loans CPF failed to

actually fund -- Crossroads announced in a letter to shareholders that, based on its "windfall associated with the PPP loan program" it was "now overcapitalized" and would pay out a special dividend of $40 per share to its shareholders on July 26, 2021. *See*

http://www.crossroads.com/wp-content/uploads/2021/07/CRSS-FQ2-2021-Shareholder-Letter.pdf (at p. 4).

86. On July 15, 2021, Crossroads issued a news release stating the special dividend of $40 per share will be payable on July 26, 2021 to stockholders of record at the close of business on July 19, 2021, and that the total amount of the dividend would be approximately $238.9 million based on the number of Crossroads shares outstanding. *See*

https://crossroads.mediaroom.com/2021-07-15-Crossroads-Systems-Provides-Additional-Information-on-Special-Dividend?pagetemplate=widgetpopup&printable.

87. As a result, and based on the respective equity interests in Crossroads, Chairman Alpert received $59,691,400 in cash from the special dividend; Crossroads's and CPF's then-dual CEO Donnelly received $90,227,080; and Alpert, Donnelly and other corporate insiders and directors collectively received $157,696,080 of the approximately $238.9 million total special dividend.

88. On December 14, 2021, Crossroads issued a news release reporting its fiscal year 2021 financial results. In that news release, Crossroads stated that its total fiscal year "revenues increased 2,446% to $932.7 million, up from $36.6 million in the comparative 2020 period"; that "[r]emoving PPP impact from the year's operations, total revenues were $34.9 million compared to $36.6 million in 2020"; that "[o]perating income increased 4,127% to $243.4 million, up from $5.8 million in 2020"; that "[t]he substantial increase in operating income was primarily due to origination fees associated with the Company's participation in the PPP loan program"; and that

22

"[c]ash EPS (operating income less income to non-controlling interests) was $36.19, which was a 4,820% increase compared to $0.74 during the same period in 2020." *See* https://www.prnewswire.com/news-releases/crossroads-systems-reports-fiscal-fourth-quarter-and-fiscal-year-2021-financial-results-301443835.html (last accessed December 29, 2021).

89.     Crossroads Board Chairman Alpert is also Chairman and Co-CEO of P10 Holdings, Inc. ("P10"), a publicly traded investment firm that provides investment advisory services to Crossroads, and is also headquartered at the same corporate headquarters as Crossroads, 4514 Cole Avenue, Suite 1600, Dallas, Texas 75205. *See* https://www.p10alts.com/team.

90.     Crossroads controlled and directed the activities of CPF, and its management even referred to the companies as if they were one specifically in the context of the PPP in public communications to shareholders, among other things. For example, in a letter to shareholders accompanying its fiscal second quarter report to shareholders for the three months ended April 30, 2021, Crossroads Board Chair Alpert and Crossroads's *and* CPF's then-dual CEO Donnelly stated that "[w]e were well equipped to lead the charge for the program's second draw as a result of *our* CDFI status" (emphasis added); that "[l]ast quarter we highlighted *our* intention to participate in the second federal PPP program" (emphasis added); that "*we* were able to issue and approve loan applications at an unprecedently rapid pace" (emphasis added); and that, "[w]ithin just five months, *we* have approved 472,036 loans at an average amount of $16,062. In total, this amounts to $7.6 billion in funding, more than 80% of which went directly to companies and independent contractors of color.") (emphasis added). *See* http://www.crossroads.com/wp-content/uploads/2021/07/CRSS-FQ2-2021-Shareholder-Letter.pdf (last accessed December 29, 2021).

91.     In sum, Crossroads participated directly and indirectly in the PPP loan processing

through its common management and control and 100% ownership of CPF; exploited CPF's

status as an SBA-approved CDFI PPP lender to enrich itself and its corporate insiders to obtain

fees on PPP loans CPF never funded, including the PPP loans of Plaintiffs and the other putative

members of the proposed class; obtained millions of dollars in PPP lender processing fees

including on the backs of the unfunded loans of Plaintiffs and the other putative members of the

proposed class; and, in turn, improperly enriched itself and its senior leadership from a federally-

backed program designed actually to help struggling small minority, women and other business

owners whose businesses were struggling amid the COVID-19 pandemic.

### CPF's Direct Participation in the
### PPP Liquidity Facility

92.     To facilitate lending under the SBA's PPP, the Federal Reserve supplied liquidity

to CPF and other participating financial institutions through term financing to be secured by the

PPP loans. *See* Board of Governors of the Federal Reserve System, Paycheck Protection

Program Liquidity Facility (PPPLF), available at

https://www.federalreserve.gov/monetarypolicy/ppplf.htm (last accessed Sept. 17, 2021).

93.     In particular, the Paycheck Protection Program Liquidity Facility ("PPPLF") was

authorized under § 13(3) of the Federal Reserve Act "to facilitate lending by eligible borrowers

[*i.e.*, PPP lenders] to small businesses under the [PPP]. … Under the Facility, the Federal

Reserve Banks ('Reserve Banks') will lend to eligible borrowers [*i.e.*, PPP lenders] on a non-

recourse basis, taking PPP Loans as collateral." *See* Paycheck Protection Program Liquidity

Facility Term Sheet, available at

https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20210625a1.pdf (last

accessed Sept. 17, 2021).

94.     Further, "[a]ll lenders that are eligible to originate PPP Loans are eligible to borrow under the Facility." *Id.*

95.     For CPF and other qualified CDFI PPP lenders, the lending Federal Reserve Bank was the Federal Reserve Bank of Cleveland. *Id.*

96.     Only SBA-guaranteed PPP loans are eligible to serve as collateral for PPPLF advances, and the principal amount advanced under the PPPLF was to be equal to the principal amount of the PPP loan pledged to secure the extension of credit. *Id.*

97.     CPF received billions of dollars of advances through the PPPLF as specified more fully below, in addition to other PPP advances.

98.     In fact, although the PPP application period ended on May 31, 2021 and the life cycle of a PPP loan application should only take a few business days, CPF continued to receive substantial advances through the PPPLF between June 30, 2021 and July 30, 2021, after the deadline for processing loan applications.

99.     For example, between July 1, 2021 and July 30, 2021, CPF received at least three PPPLF cash advances each exceeding $30,000,000.00, and also received a total of $134,119,585.79 in PPP loan advances for the month of July 2021 alone.

100.    In particular, according to a report by the Federal Reserve to the U.S. Congress dated December 13, 2021 "PPPLF Transaction-specific Disclosures (XLSX)," CPF received the following specific cash advances from the PPPLF:

| Date of Advance | Amount |
| --- | --- |
| 2021-02-02 | $2,178,040.41 |
| 2021-02-02 | $627,622.00 |
| 2021-02-11 | $5,708,115.06 |
| 2021-02-11 | $273,968.00 |
| 2021-02-11 | $2,710,413.00 |
| 2021-02-11 | $273,579.59 |

25

| **Date of Advance** | **Amount** |
|---|---|
| 2021-02-11 | $2,129,648.45 |
| 2021-02-11 | $3,693,488.60 |
| 2021-02-11 | $5,512,672.14 |
| 2021-02-25 | $1,191,862.00 |
| 2021-02-25 | $1,906,418.00 |
| 2021-02-25 | $34,357.00 |
| 2021-02-25 | $1,291,742.00 |
| 2021-02-25 | $2,976,057.35 |
| 2021-02-25 | $541,239.00 |
| 2021-02-25 | $372,863.50 |
| 2021-02-25 | $57,626.00 |
| 2021-03-01 | $354,159.11 |
| 2021-03-01 | $5,647,969.98 |
| 2021-03-02 | $325,669.00 |
| 2021-03-02 | $4,378,004.32 |
| 2021-03-02 | $1,460,686.27 |
| 2021-03-02 | $182,176.50 |
| 2021-03-02 | $215,785.00 |
| 2021-03-02 | $10,184,988.00 |
| 2021-03-02 | $586,175.75 |
| 2021-03-03 | $452,683.05 |
| 2021-03-03 | $2,161,402.00 |
| 2021-03-04 | $5,273,526.10 |
| 2021-03-09 | $5,825,425.32 |
| 2021-03-09 | $5,502,974.02 |
| 2021-03-09 | $791,045.97 |
| 2021-03-09 | $7,966,408.33 |
| 2021-03-10 | $4,144,182.85 |
| 2021-03-11 | $3,279,707.66 |
| 2021-03-15 | $22,298,842.23 |
| 2021-03-16 | $764,647.00 |
| 2021-03-16 | $17,845,001.09 |
| 2021-03-16 | $902,196.50 |
| 2021-03-16 | $1,794,125.60 |
| 2021-03-17 | $19,604,711.14 |
| 2021-03-18 | $14,608,755.33 |
| 2021-03-18 | $1,091,038.95 |
| 2021-03-19 | $12,415,131.15 |
| 2021-03-22 | $82,131,881.16 |
| 2021-03-23 | $54,386,988.50 |
| 2021-03-23 | $ 16,861,162.00 |

| Date of Advance | Amount |
|---|---|
| 2021-03-23 | $27,003,647.85 |
| 2021-03-24 | $98,770,508.82 |
| 2021-03-25 | $10,147,992.90 |
| 2021-03-29 | $479,593.40 |
| 2021-03-29 | $6,760,457.63 |
| 2021-03-29 | $11,671,507.38 |
| 2021-03-29 | $11,310,627.52 |
| 2021-03-29 | $8,987,367.00 |
| 2021-03-29 | $8,840,001.43 |
| 2021-03-29 | $8,036,480.35 |
| 2021-03-29 | $7,579,378.00 |
| 2021-03-29 | $7,687,847.70 |
| 2021-03-29 | $5,476,010.00 |
| 2021-03-29 | $3,022,105.50 |
| 2021-03-29 | $2,097,367.75 |
| 2021-03-29 | $7,343,229.25 |
| 2021-03-29 | $5,352,732.72 |
| 2021-03-29 | $3,907,229.00 |
| 2021-03-29 | $3,074,780.48 |
| 2021-03-29 | $2,324,503.09 |
| 2021-03-29 | $947,087.00 |
| 2021-03-29 | $2,505,979.50 |
| 2021-03-29 | $1,170,854.10 |
| 2021-03-29 | $4,357,560.50 |
| 2021-03-30 | $79,562,983.00 |
| 2021-03-30 | $102,496,216.00 |
| 2021-03-30 | $72,574,056.00 |
| 2021-03-30 | $84,507,665.00 |
| 2021-03-31 | $75,764,259.00 |
| 2021-04-01 | $9,549,671.89 |
| 2021-04-01 | $39,612,141.00 |
| 2021-04-02 | $243,075,429.00 |
| 2021-04-06 | $257,472,124.33 |
| 2021-04-06 | $132,444,399.00 |
| 2021-04-07 | $10,927,697.00 |
| 2021-04-07 | $62,021,483.00 |
| 2021-04-08 | $85,339,435.12 |
| 2021-04-08 | $259,374,000.00 |
| 2021-04-16 | $126,501,443.00 |
| 2021-04-16 | $181,211,831.00 |
| 2021-04-16 | $162,256,760.73 |

| Date of Advance | Amount |
|---|---|
| 2021-04-16 | $16,005,416.00 |
| 2021-04-16 | $176,063,638.00 |
| 2021-04-20 | $15,295,725.00 |
| 2021-04-21 | $12,171,969.60 |
| 2021-04-21 | $5,953,438.16 |
| 2021-04-21 | $38,643,341.00 |
| 2021-04-21 | $96,987,237.00 |
| 2021-04-21 | $48,105,810.00 |
| 2021-04-23 | $58,507,134.00 |
| 2021-04-23 | $368,780,681.00 |
| 2021-04-23 | $327,135,009.82 |
| 2021-04-23 | $70,865,658.00 |
| 2021-04-26 | $114,086,044.00 |
| 2021-04-30 | $5,717,971.00 |
| 2021-05-03 | $1,765,216.00 |
| 2021-05-03 | $2,944,483.47 |
| 2021-05-03 | $2,096,650.00 |
| 2021-05-04 | $2,293,625.00 |
| 2021-05-04 | $34,802,766.00 |
| 2021-05-06 | $2,125,832.00 |
| 2021-05-06 | $1,070,106.00 |
| 2021-05-06 | $616,115.00 |
| 2021-05-06 | $835,290.00 |
| 2021-05-07 | $365,435.00 |
| 2021-05-12 | $263,080,394.00 |
| 2021-05-12 | $33,579,305.00 |
| 2021-05-12 | $16,088,836.00 |
| 2021-05-12 | $5,443,630.00 |
| 2021-05-12 | $890,741.00 |
| 2021-05-12 | $1,413,197.00 |
| 2021-05-17 | $1,851,188.00 |
| 2021-05-17 | $1,577,688.00 |
| 2021-05-17 | $1,581,021.00 |
| 2021-05-17 | $8,630,450.25 |
| 2021-05-18 | $1,101,950.00 |
| 2021-05-18 | $577,710.00 |
| 2021-05-18 | $535,369,687.12 |
| 2021-05-20 | $33,419,154.94 |
| 2021-05-20 | $46,027,570.00 |
| 2021-05-24 | $11,859,766.00 |
| 2021-05-25 | $9,886,972.00 |

| Date of Advance | Amount |
|---|---|
| 2021-05-25 | $2,365,516.00 |
| 2021-05-25 | $600,024.00 |
| 2021-05-25 | $1,831,023.00 |
| 2021-05-28 | $1,902,346.00 |
| 2021-05-28 | $5,249,415.00 |
| 2021-05-28 | $1,677,600.00 |
| 2021-06-02 | $2,478,525.99 |
| 2021-06-02 | $395,067.00 |
| 2021-06-02 | $574,919.00 |
| 2021-06-04 | $2,086,894.92 |
| 2021-06-04 | $834,823.00 |
| 2021-06-04 | $1,120,999.32 |
| 2021-06-04 | $80,299,469.78 |
| 2021-06-04 | $147,886,129.00 |
| 2021-06-10 | $1,805,560.00 |
| 2021-06-10 | $700,921.00 |
| 2021-06-10 | $1,143,936.00 |
| 2021-06-10 | $12,226,237.00 |
| 2021-06-10 | $968,115.00 |
| 2021-06-16 | $1,729,026.00 |
| 2021-06-16 | $933,469.00 |
| 2021-06-16 | $46,130,527.00 |
| 2021-06-17 | $484,266.07 |
| 2021-06-17 | $542,102.00 |
| 2021-06-17 | $807,337.00 |
| 2021-06-18 | $49,044,789.00 |
| 2021-06-22 | $16,783,373.00 |
| 2021-06-23 | $515,136,782.00 |
| 2021-06-23 | $312,406,138.00 |
| 2021-06-24 | $8,087,276.00 |
| 2021-06-24 | $15,750,200.00 |
| 2021-06-24 | $23,444,948.00 |
| 2021-06-25 | $1,627,318.00 |
| 2021-06-25 | $1,400,035.00 |
| 2021-06-25 | $2,004,933.00 |
| 2021-06-25 | $1,331,199.00 |
| 2021-06-25 | $1,303,819.32 |
| 2021-06-25 | $149,773.00 |
| 2021-06-29 | $2,496,951.63 |
| 2021-06-29 | $538,849.00 |
| 2021-06-29 | $41,636.00 |

| **Date of Advance** | **Amount** |
|---|---|
| 2021-06-29 | $126,344.00 |
| 2021-06-29 | $1,119,986.00 |
| 2021-06-29 | $179,504.00 |
| 2021-06-29 | $244,511.00 |
| 2021-06-29 | $26,324.00 |
| 2021-06-29 | $127,795.00 |
| 2021-06-29 | $144,425.00 |
| 2021-06-29 | $39,294.00 |
| 2021-06-29 | $114,014.00 |
| 2021-06-29 | $5,000.00 |
| 2021-06-29 | $1,140,000.00 |
| 2021-06-29 | $7,642,798.00 |
| 2021-06-29 | $101,233,693.33 |
| 2021-06-30 | $194,761.00 |
| 2021-07-01 | $35,891,616.00 |
| 2021-07-01 | $217,926.00 |
| 2021-07-01 | $436,360.00 |
| 2021-07-06 | $38,610,016.00 |
| 2021-07-06 | $1,025,508.00 |
| 2021-07-06 | $62,496.00 |
| 2021-07-07 | $7,098,589.00 |
| 2021-07-13 | $1,219,924.00 |
| 2021-07-13 | $452,164.00 |
| 2021-07-14 | $385,525.00 |
| 2021-07-14 | $41,193,415.00 |
| 2021-07-29 | $239,725.00 |
| 2021-07-30 | $72,735.00 |
| 2021-07-30 | $6,304,677.00 |
| 2021-07-30 | $858,609.79 |
| 2021-07-30 | $32,930.00 |
| 2021-07-30 | $17,370.00 |
| ***Total*** | **$6,458,857,759.43** |

*See* Board of Governors of the Federal Reserve System, Paycheck Protection Program Liquidity

Facility (PPPLF), available at https://www.federalreserve.gov/monetarypolicy/ppplf.htm (last

accessed Dec. 23, 2021).

101.    As alleged below, while CPF reportedly received over $6.4 billion from the

PPPLF in 2021 alone, CPF failed to actually fund PPP loans approved by the SBA for Plaintiffs

30

and numerous other SBA-approved borrower members of the proposed class. CPF failed to fund

class member approved loans, moreover, despite having actually received the unfunded PPP loan

proceeds via advances from the PPPLF secured by the PPP loans, including the PPP loans it

failed to fund.

102.    Although no discovery has occurred yet in this case, emails produced in

Womply's litigation against Defendants reflect Defendants knew of CPF's failure to fund SBA-

approved PPP loans. For example, one such unfunded borrower wrote an email to Christopher

Dalton ("Dalton") of the SBA on June 24, 2021 stating as follows:

> "Hi Christopher, This is Minority women own small business for 14 years Covid
> 19 destroyed my business . SBA approved ppp loan . I email to Ms .Faranza giga
> capital plus , I got respond from Greg Jacobson i give him my information still no
> respond . 'I NEED HELP.' My lender is Capital Plus My loan no is . First draw
> ppp loan . Amount of loan is not big but for me is really helpful to restart my
> business . Thank you,"

Dalton forwarded that email to Donnelly and CPF employee Greg Jacobson ("Jacobson") on

June 25, 2021 and Jacobson, in turn, forwarded it to representatives of Womply also on June 25,

2021, stating "please see below a request for status from the SBA" and "also confirm all else is

getting funded ...." Another email dated June 18, 2021 by CPF's CFO Farzana Giga to Connie

Spencer-Adams of Womply stated as follows: "Any loans not sent to BA/CPF by 6/23 will not

be able to get funds and none of us want to deal with that."

103.    Furthermore, Defendants cite totally distinguishable cases involving *prospective*

PPP loan applicants rather than, as here, SBA-*approved* borrowers, *delayed* PPP loan payments,

and PPP loan processing fee "agent" cases (ECF 25 at ECF pp's 10-11), and then glibly and

callously assert that "Plaintiff's misleading claim in this case, that CPF 'failed to fund' a loan it

agreed to make, suggests that litigants seeking to exploit the PPP for private gain are simply

running out of ideas." *Id.* at ECF p. 11. In truth, Plaintiffs -- who are small business owners

31

involved, respectively, in insurance inspection, auto repair, landscaping and support for artists and writers -- are among the very intended beneficiaries that Congress designed the PPP to assist and CPF was contractually obligated but failed to fund.

### CPF's Failure to Fund
### Plaintiff Greathouse's PPP Loan

104.    When the pandemic began, Plaintiff Greathouse was, and continues to be, in the business of providing insurance inspection services in the Russellville, Arkansas area.

105.    Due to the pandemic, Plaintiff was not able to provide these services with the same frequency and, as a result, lost significant income.

106.    On or about April 8, 2021, Greathouse applied for a PPP loan with CPF. Greathouse submitted all requested documentation and information.

107.    On or about April 9, 2021, the SBA approved Greathouse's PPP loan application and assigned it a loan number (SBA Loan Number 9988328700).

108.    Greathouse was approved for a PPP loan in the amount of $15,665.00.

109.    On April 18, 2021, Greathouse received the standard form PPP promissory note (the "Note") and accompanying documents for him to sign.

110.    The Note identified the SBA loan number and amount, Defendant CPF as the lender and Plaintiff Greathouse as the borrower; set forth payment terms, potential events of default, CPF's rights in the event of default, and other terms and conditions; and provided the terms for Plaintiff Greathouse to repay the loan to CPF if it was not forgiven.

111.    The Note also included a standard form Additional and Correction Documents Agreement (Errors and Omissions Agreement) between CPF and Plaintiff Greathouse; a Business Purpose Statement; a Notice - No Oral Agreements bearing the signature CPF Chief Financial Officer Giga and Plaintiff Greathouse; a Written Consent of Governing Body form for

Greathouse to represent that he is authorized to receive the loan and on which CPF may rely; an IRS W-9 Request for Taxpayer Identification Number and Certification; and an Information and Bank Account Certification and Authorization form identifying the bank or other account to which CPF was obligated to send the funds (collectively, the "Loan Documents").

112.    On April 18, 2021, Greathouse signed and returned the Loan Documents in order to obtain the $15,665.00 PPP loan.

113.    Also on April 18, 2021, Greathouse was advised by email that his loan was approved and is being funded.

114.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Greathouse never received the proceeds of his SBA-approved PPP loan.

115.    For example, Greathouse contacted and consulted with his local SBA office about CPF's failure to fund his PPP loan, and sent emails and made numerous telephone calls to CPF and Blueacorn to try to follow-up and get funded, all to no avail.

116.    On July 19, 2021, and following his complaints to the local SBA office and telephone calls again seeking funding, Greathouse was advised on July 19, 2021 that his PPP loan was being funded within an estimated three to six days.

117.    Although the SBA's records reported that Greathouse's PPP loan had actually been funded, Greathouse never received any PPP loan proceeds.

118.    The SBA's record of the alleged disbursement of Greathouse's loan proceeds was based on data CPF provided to the SBA.

33

119.    CPF's failure to fund Greathouse's SBA-approved PPP loan deprived Greathouse of funds that would have directly assisted in the operation of his business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund**
**Plaintiff Covarrubias's PPP Loan**

120.    When the pandemic began, plaintiff Covarrubias was, and continues to be, in the business of providing auto repair services in the Santee, California area.

121.    Due to the pandemic, plaintiff Covarrubias's business lost significant income.

122.    In or about May 2021, Covarrubias applied for a PPP loan with CPF. Covarrubias submitted all requested documentation and information.

123.    In May 2021, the SBA approved Covarrubias's PPP loan application and assigned it a loan number (SBA Loan Number 4713608906).

124.    Covarrubias was approved for a PPP loan in the amount of $8,332.00.

125.    On May 21, 2021, Covarrubias received the same standard form PPP promissory Note and accompanying standard form Loan Documents for him to sign that plaintiff Greathouse also received and signed.

126.    On May 21, 2021, Covarrubias signed and returned the Loan Documents in order to obtain the $8,332.00 PPP loan.

127.    Also on May 21, 2021, Covarrubias was advised by email that his loan was approved and is being funded.

128.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Covarrubias never received the proceeds of his SBA-approved PPP loan. Covarrubias attempted to contact CPF directly to get his loan funded, but was unable to reach anyone live with whom to speak. As he

34

stated in a December 8, 2021 email to an SBA representative, there was a "lack of customer service and being able to get ahold of a live person being nonexistent made things worse."

129. Covarrubias also contacted the SBA directly about CPF's failure to fund his PPP loan, and sent emails and made numerous telephone calls to CPF and SBA to try to follow-up and get funded, all to no avail.

130. For example, Covarrubias sent an email to a SBA representative on November 29, 2021 stating "If the loan had been canceled and return why was I able to get approved for my loan to be forgiven. Someone kept that money knowing that if I didn't get my loan forgiven I would be on the hook for paying it back. I would've been out of time to apply for the loan to be forgiven [] I would've been responsible for paying loan back if the loan was still in limbo." The SBA representative replied to him that same day by email stating "I understand this has happened to a lot of individuals, but therefore the SBA is program -- the bank utilize [sic] just like a mortgage done by Fanny/Freddie. Yes, it is backed by a Government program, but it is managed and held with a bank or lending institution. We don't approve, deny, or withdraw any requests, because they are not our loans."

131. Similarly, in a September 29, 2021 email Covarrubias sent to the Blueacorn portal after Blueacorn refused to assist in getting CPF to fund his loan, Covarrubias sought further information regarding the whereabouts of the PPP loan proceeds he was approved by the SBA to receive, and which SBA records falsely showed were disbursed to him and as to which he was be obligated to repay plus interest:

> "First and foremost those documents I originally sent in where prove enough for
> the SBA to approve my loan and give me a loan number. Second had my loan
> been denied I wouldn't of received an email reminding me about the loan
> forgiveness. Why haven't I received an email from you or my lender telling me to
> get my loan forgiven. I know why because than you would be committing a fraud.
> What your trying to do is wait everyone out until the very last minute who has

35

$8332 just laying around to pay the loan back when it could all just go away with the loan forgiveness, oh but wait what happens to the $8332 dollars of mine that the SBA approved who gets that money. Well that money who knows where it went it just disappeared it vanished along with thousands of other people's PPP loans BLUE ACORN AND CAPITAL PLUS FINANCIAL HAVE STOLEN LIED ABOUT BEING DISBURSED. I NEVER RECEIVED NOT ONE PHONE CALL FROM EITHER BLUE ACORN OR CAPITAL PLUS FINANCIAL." (emphasis in original)

132.    Covarrubias still persisted in his efforts to actually get his SBA-approved loan funded.

133.    Although the SBA's records reported that Covarrubias's PPP loan had actually been funded, Covarrubias never received any PPP loan proceeds.

134.    The SBA's record of the alleged disbursement of Covarrubias's loan proceeds was based on data CPF provided to the SBA.

135.    CPF's failure to fund Covarrubias's SBA-approved PPP loan deprived Covarrubias of funds that would have directly assisted in the operation of his business and resulted in lost opportunities and other consequential damages.

### CPF's Failure to Fund
### Plaintiff Sumrall's PPP Loan

136.    When the pandemic began, plaintiff Sumrall was, and continues to be, in the business of providing landscape architectural services in the El Paso, Texas area.

137.    Due to the pandemic, plaintiff Sumrall was not able to provide these services with the same frequency and, as a result, lost significant income.

138.    On or about May 18, 2021, Sumrall applied for a PPP loan with CPF. Sumrall submitted all requested documentation and information.

139.    In May 2021, the SBA approved Sumrall's PPP loan application and assigned it a loan number (SBA Loan Number 5126489010).

140. Sumrall was approved for a PPP loan in the amount of $4,095.00.

141. Also in May 2021, Sumrall received the same standard form Note and accompanying Loan Documents for her to sign that plaintiff Greathouse received, and Sumrall signed and returned the Loan Documents in order to obtain the $4,095.00 PPP loan.

142. Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Sumrall never received the proceeds of her SBA-approved PPP loan.

143. For example, Sumrall contacted the Blueacorn for any information it had about CPF's obligation to fund her loan and, by email on May 29, 2021, was told that "[i]f your application is SBA approved, you can be rest assured that your funds are secure and they will be transferred to your account." Sumrall replied as follows:

> "I understand you may be very busy but I have lost 2 people to COVID my business home and family a on the brink. There has been no light in sight. I have passed every identity verification process. I never once stated anything about fraud. Please explain why I was approved and signed your promissory note and have no money and now this. Please explain."

144. Although the SBA's records reported that Sumrall's PPP loan had actually been funded, Sumrall never received any PPP loan proceeds.

145. The SBA's record of the alleged disbursement of Sumrall's loan proceeds was based on data CPF provided to the SBA.

146. CPF's failure to fund Sumrall's SBA-approved PPP loan deprived Sumrall of funds that would have directly assisted in the operation of her business and resulted in lost opportunities and other consequential damages.

37

**CPF's Failure to Fund**
**Plaintiff Myles's PPP Loan**

147.    When the pandemic began, plaintiff Myles was, and continues to be, in the business of providing services to independent artists, writers and performers in the Raeford, North Carolina area.

148.    Due to the pandemic, plaintiff Myles's business was damaged and, as a result, lost significant income.

149.    In or about May 2021, Myles applied for a PPP loan with CPF.

150.    Also in May 2021, the SBA approved Myles's PPP loan application and assigned it a loan number (SBA Loan Number 5742309006).

151.    Myles was approved for a PPP loan in the amount of $11,497.00.

152.    In May 2021, Myles received and properly signed and returned the same standard form Note and accompanying Loan Documents that plaintiff Greathouse received.

153.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Myles never received the proceeds of her SBA-approved PPP loan.

154.    For example, in an email on August 11, 2021, Myles summarized her experience as follows:

> "I also can show text messages beginning in 10/2019 until this year. I began proceedings for this singing competition in October 2019, communicated with the Director at Cole Auditorium in February 2020. I have the messages. Also, if you requested all of the information that you stated I did not present to you, I would like to know when, how, and a completed copy of what you were requesting. I was never to start the business because of the pandemic so there wasn't any taxes to file, no revenue, nothing. And finally, if you needed all of the documentation that you claim I did not submit, why was I ever approved and sent a check to my bank account?

I will expect answers, I will not allow you all to treat me this way, and I will fight for my right to have the check that was sent to me, returned. My account had not been negative for a long time, but because I was informed that I had been approved, I went in debt to open a business bank account, pay over $2000 for a website, and many meetings.

I want the funds I was approved for returned to me or we will be in the news. And don't say I am threatening you because I am not.... this is a promise. You will not give and then take back, and think you're going to get away with it."

155.    Although the SBA's records reported that Myles's PPP loan had actually been

funded, Myles never received any PPP loan proceeds.

156.    The SBA's record of the alleged disbursement of Myles's loan proceeds was

based on data CPF provided to the SBA.

157.    CPF's failure to fund Myles's SBA-approved PPP loan deprived Myles of funds

that would have directly assisted in the operation of her business and resulted in lost

opportunities and other consequential damages.

### CPF's Failure to Fund Other SBA-Approved Class Member Borrower PPP Loans

158.    Again while Defendants contend that "CPF is committed to its borrowers'

satisfaction" and that "the vast majority of CPF's borrowers have reported no issues receiving

their loans" (ECF 25 at ECF p. 9), the truth is that, in addition to Plaintiffs' experiences,

numerous other PPP borrowers across the United States have complained publicly about CPF's

failure to fund their PPP loans, examples of which include the following:

a.    "Capital Plus Financial has kept hundreds of people's PPP loans that were already approved by the SBA." (Consumer Financial Protection Bureau Complaint Database, Complaint No. 4409176, May 26, 2021, https://www.consumerfinance.gov/data-research/consumer-complaints/, last accessed Dec. 23, 2021);

b.    "I hope capital plus financial is shut down after this, and that's on god. They deserve to lose all of their financial accreditations and business licenses. I have

39

never in my life been in a situation like this with a financial institution that cuts off all methods of contact/communication for months at a time with zero explanation." (Consumer complaint, June 2020, https://www.reddit.com/r/Blueacorn/comments/nci8lm/just_got_off_the_phone_w ith_an_sba_rep_in_tx/, last accessed Dec. 23, 2021);

c. "[T] they don't have a ETA on when my funds will be sent to my account. They do not have a phone to contact them, the lender Capital Plus Financial doesn't have a way for me to contact. I have emailed the CEO of capital plus financial every single day which is the lender and I have not heard anything from them at all." (Consumer Financial Protection Bureau Complaint Database, Complaint No. 4348481, May 4, 2021, https://www.consumerfinance.gov/data-research/consumer-complaints/, last accessed Dec. 23, 2021);

d. "I signed on April 8th and it says that my friends have been transferred or deposited and I have not seen a dime has anybody reported this to the SBA?" (June 2021 Consumer Complaint, https://www.reddit.com/r/PPPLoans/comments/ms0pzr/anybody_been_funded_by _capital_plus_financial/gz92tah/?utm_source=reddit&utm_medium=web2x&cont ext=3, last accessed Dec. 23, 2021);

e. "If they broke they really need to just say that and send me to another lender or something because at this point they owe me." (Consumer complaint, May 2021, Facebook Group PPP Funding Group, https://www.facebook.com/groups/442306946857529/posts/456065148815042, last accessed Dec. 23, 2021);

f. "They are making up the rules as they go, holding money that doesn't belong to them. This is not what SBA intended." (Consumer complaint June 2021, change.org, https://www.change.org/p/ppp-fraud-by-blueacorn-and-capital-plus-financial-failure-to-deliver-sba-funds?utm_source=share_petition&utm_medium=custom_url&recruited_by_id=9 da43a80-c0d6-012f-2f2f-4040496dcccb, last accessed Dec. 23, 2021); and

g. "Other delay tactics are mistakes on bank account information you didn't make, an inability to correct mistakes you did make and an inability to reach anyone at both companies. They are holding funds and not delivering money to borrowers. SBA tells you to resolve with a lender you can't reach directly and never returns calls." (Change.org Petition: *Report PPP fraud by Blueacorn and Capital Plus Financial Failure to Deliver SBA Funds*, 147 supporters, last accessed Dec. 23, 2021).

159.     Indeed, Defendants have reportedly received so many complaints about CPF's

failure to fund SBA-approved PPP loans that they actually had to add a warning to CPF's

website about communications to CPF regarding PPP lending which stated as follows:

NOTICE CONCERNING THREATENING OR HARASSING
COMMUNICATIONS

The partnership of Capital Plus Financial and Blue Acorn has successfully served
hundreds of thousands of individuals and small businesses through the funding of
Paycheck Protection Program (PPP) loans.

Feedback from customers is always appreciated. Customer service remains our
top priority.

However, we will not tolerate any threatening or harassing actions or
communications from customers in any form.

Any communication from an applicant we deem threatening, harassing or
intimidating will result in the immediate withdrawal of the loan.

Additionally, we will pursue all available criminal and civil legal avenues to
defend and protect our companies and our associates. Our team includes former
federal agents and prosecutors. We are working closely with federal, state, and
local law enforcement to identify and prosecute those who would make threats
against our companies or our associates. We will pursue these options to the
fullest extent of the law.

*See* https://capitalplusfin.com/home/ (visited Dec. 26, 2021).

160.     CPF failed to fund the SBA-approved PPP loans of Plaintiffs and other Class

member borrowers despite the fact that CPF itself participated in the Program directly also as a

beneficiary, having received the PPP loan on April 13, 2020 of reportedly $376,800. *See, e.g.*,

Capital Plus Financial LLC in Bedford, TX - SBA PPP Loan Data (Paycheck Protection

Program) (federalpay.org) (accessed on Dec. 28, 2021).

**Class Action Allegations**

161.     Plaintiffs bring this action individually and on behalf of the following national

class (the "Class") and subclasses:

41

**National Class:** All persons and entities in the United States who, in 2021, applied for PPP loans with defendant CPF as the lender for whom the SBA provided an SBA loan number, and who executed and submitted their Loan Documents but did not receive the PPP loan proceeds.

**California Subclass:** All persons and entities in California who, in 2021, applied for PPP loans with defendant CPF as the lender for whom the SBA provided an SBA loan number, and who executed and submitted their Loan Documents but did not receive the PPP loan proceeds.

**North Carolina Subclass:** All persons and entities in North Carolina who, in 2021, applied for PPP loans with defendant CPF as the lender for whom the SBA provided an SBA loan number, and who executed and submitted their Loan Documents but did not receive the PPP loan proceeds.

162. Excluded from the Class and subclasses are Defendants, any entities in which Defendants have a controlling interest, Defendants' agents and employees, any Judge to whom this action is assigned, and any member of such Judge's staff and immediate family.

163. There is a well-defined community of interest among members of the Class and subclasses, and the disposition of their claims in a single action will benefit the parties and the Court.

164. The proposed Class and subclasses meet each applicable requirement of Fed. R. Civ. P. 23.

165. *Numerosity*: While the exact number of members of the Class and subclasses are unknown at this time and can be determined by appropriate discovery, the Class and each subclass includes numerous members such that joinder of all members is impracticable within the meaning of Rule 23(a)(1).

166. *Ascertainability*: Names and addresses of members of the Class and subclasses are available from Defendant CPF's records and potentially other sources including publicly available databases. Notice can be provided to the members of the Class and subclasses through

direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in class action litigation.

167.   *Typicality:* Plaintiffs' claims are based on the same facts and legal theories as those of the other members of the Class and subclasses which Plaintiffs seek to represent. Plaintiffs and the members of the Class and subclasses all similarly applied for PPP loans, had their loans approved by the SBA, but did not receive their PPP loan proceeds from CPF despite the parties' loan contracts.

168.   *Adequacy*: Plaintiffs will fairly and adequately represent the interests of the members of the Class and respective subclasses. Plaintiffs are adequate representatives of the Class and respective subclasses as their interests align with the interests of the members of the Class and respective subclasses, and Plaintiffs are represented by counsel skilled and experienced in class actions, including financial consumer and other class action litigation.

169.   *Superiority:* A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action because the expense and burden of individual litigation makes it economically unfeasible for members of the Class and subclasses to seek to redress their claims other than through a class action; if separate actions were brought by individual members of the Class and subclasses, the resulting duplicity of lawsuits could lead to differing and inconsistent adjudications; and, absent a class action, Defendants are unlikely to be held accountable for CPF's failure to actually fund all applicable SBA-approved PPP loans.

170.   *Predominance and Commonality*: Common questions of law and fact exist and predominate over any questions which affect individual members of the Class and subclasses. Common questions of fact and law include, but are not limited to:

a.  whether defendant CPF failed to fund SBA-approved PPP loans to Plaintiffs and other members of the Class and subclasses in breach of its obligations to actually fund such loans;

b.  whether CPF and Crossroads obtained fees for PPP loans that CPF did not make;

c.  whether CPF's corporate parent, Crossroads, controlled CPF and was unjustly enriched by obtaining fees for PPP loans;

d.  whether CPF's failure to fund SBA-approved PPP loans violated the Loan Documents it entered into with Plaintiffs and other members of the Class and subclasses; and

e.  whether defendant CPF's failure to fund SBA-approved PPP loans and Crossroads's receipt of PPP loan fees damaged Plaintiffs and the members of the Class and subclasses.

171.   Plaintiffs reserve the right to amend the definition of the Class and subclasses if discovery or further investigation reveals that the definition of the Class or subclasses should be amended.

## COUNT ONE
### Breach of Contract
### (Against CPF)

172.   Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

173.   This Count is alleged by all Plaintiffs against only defendant CPF.

174.   The standard form promissory Note and accompanying Loan Documents that CPF and the members of the proposed Class entered into are binding, enforceable agreements. Among other provisions, the Note identifies the specific PPP loan, loan number and amount of the loan; specifies that the parties to the Note are, respectively, the Class member borrower and the "Lender" CPF; provides that, "[t]his loan is made pursuant to the PPP"; requires the borrower to pay back the principal of the loan plus interest if the PPP loan is not forgiven; contains other PPP

loan repayment terms and events of default and the lender's rights in the event of the borrower's default; and contains general provisions, including specifically that "[a]ll individuals and entities signing this Note are jointly and severally liable[.]"

175.    In addition, the Additional and Correction Documents Agreement (Errors and Omissions Agreement) that accompanies the promissory Note between the Plaintiff class member borrowers and CPF provides additional terms and states, at the outset, explicitly as follows:

> "In consideration of Capital Plus Financial, LLC, located at 2247 Central Drive, Bedford, Texas 76021 (hereinafter called 'Lender') making the above loan, each of the undersigned, jointly and severally, do hereby agree as follows …."

176.    The Loan Document contracts entered into by CPF and the putative members of the alleged borrower Class also include a "Notice - No Oral Agreements" document that governs the "Loan by Lender, Capital Plus Financial, LLC to Borrower"; identifies each Class member borrower; and is executed by both CPF via its CFO Giga, and each putative Class member borrower.

177.    A complete copy of the Loan Document plaintiff Greathouse agreed to is attached to this Complaint as Exhibit A (with only plaintiff Greathouse's Social Security and bank account numbers redacted).

178.    Through its agreement to make PPP loans via the Loan Documents and as the counterparty to the Loan Documents, CPF entered into binding agreements with Plaintiffs and the members of the proposed Class to fund their respective PPP loans.

179.    Further, CPF had an implied duty to act in good faith and in accordance with fair dealing to take all steps necessary to fund Plaintiffs' and the Class members' PPP loans pursuant to the Loan Documents.

180.     In addition, CPF and its corporate parent Crossroads also acted consistent with, reaped the benefits of and made numerous representations confirming CPF's agreement to fund Plaintiffs' loans. For example, defendant Crossroads reported that "the Company" made $930 million in PPP loan fees by representing to the SBA that it had funded Plaintiffs' and other PPP loans. Defendant CPF also obtained billions of dollars from the PPPFL by pledging Plaintiffs' and other borrowers' loans as collateral. Defendant CPF could not properly secure PPPLF advances on loans it would not fund. Defendant CPF also consistently reported to the SBA that it had funded class members' loans.

181.     Defendant CPF breached its obligations to fund Plaintiffs' and the Class members' PPP loans under the Loan Documents by failing to fund their loans.

182.     Moreover, all PPP loan applications require applicants to certify that they have not, and will not, receive other PPP loans.

183.     As a result, once Plaintiffs and the other members of the Class applied for PPP loans and their loan applications were approved by the SBA and assigned PPP loan numbers pursuant to the Loan Documents, Plaintiffs and the Class members were no longer able to apply for PPP loans with other PPP lenders as they would not be able to certify that they would not receive another PPP loan.

184.     Plaintiffs and the Class members were therefore effectively bound to, and had to rely exclusively on, CPF to actually abide by their Loan Document commitments to provide them with the PPP loan funds that the SBA had already approved.

185.     As a result, CPF harmed Plaintiffs and the members of the Class in an amount to be determined at trial, but not less than the amount of the wrongfully withheld PPP loan proceeds plus all other applicable damages to the full extent permissible by law.

## COUNT TWO
### Breach of Contract
### (Against Crossroads)

186.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

187.    This Count is alleged by all Plaintiffs against only defendant Crossroads.

188.    As more fully described above, Crossroads exercised substantial control over CPF, operated with CPF as a single enterprise, held out in its SEC filings and other public statements that it was one and the same companies, participated in CPF's PPP loan processing practices, and exploited CPF's status as an SBA-approved CDFI lender to enrich itself and its corporate insiders through improperly obtained funds.

189.    Crossroads also exercised its control over CPF to cause CPF to "upstream" to Crossroads hundreds of millions of dollars in PPP-related loan processing fees and PPPLF loan advances, notwithstanding that CPF had not funded Plaintiffs' and Class members' loans on account of which CPF received those funds.

190.    Accordingly, Crossroads also breached the Loan Agreement contracts Plaintiffs entered into with CPF because Crossroads controlled the conduct of, and is thus also liable for, CPF's breaches of those contracts. In addition, under the principles of equity and good conscience, Crossroads should not be permitted to retain the funds it received as a result of CPF's breaches of contract and Plaintiffs' and Class members' unfunded loans.

191.    As a result of the foregoing, Crossroads is liable to Plaintiffs and Class members as CPF's alter ego, for the amount of the wrongfully withheld PPP loan proceeds plus all other applicable damages to the full extent permissible by law.

192.    As a result of the foregoing, the corporate veil of CPF should be pierced, and Crossroads should be held liable to Plaintiff sand Class members for the amount of the wrongfully withheld PPP loan proceeds plus all other applicable damages to the full extent permissible by law.

## COUNT THREE
### Unjust Enrichment
### (Against Both Defendants)

193.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

194.    All Plaintiffs allege this Count against both Defendants. Plaintiffs allege this Count only in the alternative, to the extent Plaintiffs' breach of contract claims fail to adequately compensate Plaintiffs and Class members for the Defendants' violations as alleged herein.

195.    Plaintiffs and Class members conferred a monetary benefit on Defendants. Specifically, they chose CPF to process and fund their PPP loans. In exchange, Plaintiffs and Class members should have received the funds to which they were entitled.

196.    Defendants received PPPLF advances and PPP loan processing fees based, at least in part, on the unfunded loans of the Plaintiffs and Class members.

197.    Defendants appreciated or had knowledge of the benefits they received as a result of the Plaintiffs' and Class members' approved loans and they accepted and retained those benefits. Defendants profited from Plaintiffs' and Class members' PPP loan transactions and used the funds resulting therefrom for business purposes and for the personal gain of Crossroads's shareholders, as alleged more fully above.

198.    Crossroads controlled and directed the activities of CPF for purposes of the PPP also as alleged more fully above, and CPF should have timely and properly funded Plaintiffs' and Class members' PPP loans.

199.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the funds they received as a result of Plaintiffs' and Class members' unfunded loans, without having disbursed those or other funds to fund the loans to which Plaintiffs and Class members were entitled.

200.    CPF did not fund those loans, and therefore did not provide full compensation for the benefit Plaintiffs and Class members provided.

201.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered and will suffer injury.

202.    Defendants should not be permitted to unjustly enrich themselves at the expense of Plaintiffs and Class members, but in equity and good conscience should be required to make restitution for all funds acquired as a result of Defendants' unlawful conduct.

203.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that it unjustly received as a result of Plaintiffs' and Class members' PPP loans.

## COUNT FOUR
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (Against Both Defendants)

204.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

205.    The California Unfair Competition Law ("UCL") defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

206.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

207.    Plaintiff Covarrubias brings this claim individually and on behalf of the California subclass and has standing to bring this claim because he is and at all times relevant was a resident of California and is subject to the protection of the UCL.

208.    CPF's failure to fund SBA-approved PPP loans breached the Loan Documents and accompanying legal duties it owed plaintiff Covarrubias and the other members of the California subclass.

209.    As a result of its failure to fund the SBA-approved PPP loans, CPF obtained fees and other compensation to which it was not entitled, including fees on loans it never funded and loan proceeds rightfully belonging to plaintiff Covarrubias and the California subclass, and wrongfully deprived plaintiff Covarrubias and the members of the California subclass of PPP loan proceeds.

210.    When the PPP loans of plaintiff Covarrubias and the California subclass were approved by the SBA, these SBA-approved borrowers had a vested interest in the PPP loan proceeds which CPF wrongfully withheld.

211.    CPF's failures to fund these PPP loans thereby constitute a violation under the "unlawful" prong of the UCL.

212.    Similarly, CPF's failure to fund SBA-approved loans also constitutes "unfair" acts and practices under the UCL because CPF's acts and practices as alleged offend public

policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to plaintiff Covarrubias and the members of the California subclass.

213.    CPF's breaches of contract -- including not disbursing SBA-approved loan funds and "locking" these borrowers into CPF -- constitute an unfair practice because those breaches are immoral, unethical, oppressive, unscrupulous, or substantially injurious.

214.    Once the loan applications of plaintiff Covarrubias and other similarly situated members of the California subclass were approved by the SBA, these subclass member borrowers had to rely exclusively on CPF to actually fund their PPP loans and were thereby precluded from seeking PPP loans from other lenders, also as alleged above.

215.    CPF's failure to fund PPP loans of plaintiff Covarrubias and the other members of the California subclass constitute unlawful and unfair business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200.

216.    As a result of CPF's violations of the UCL, plaintiff Covarrubias and the members of the California subclass are, in the alternative and to the extent that their breach of contract claim fails to adequately award their damages for CPF's violations as alleged herein, entitled to equitable relief, including specifically injunctive relief directing CPF to fund their SBA-approved loans in full with applicable interest from the date the loans should have been funded, or restitution for the amount of the wrongfully withheld PPP loan proceeds plus interest.

217.    Defendant Crossroads is liable to plaintiff Covarrubias and the members of the California subclass by virtue of its control of CPF and it being CPF's alter ego and by virtue of its direct participation in PPP lending and both Defendants' violations and failure to fund the SBA-approved PPP loans at issue, all as also alleged more fully above.

## COUNT FIVE
### North Carolina Unfair and Deceptive Trade Practices Act
### N.C. Gen. Stat. Ann. §§ 75-1.1, et seq.
### (Against Both Defendants)

218.     Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

219.     Plaintiff Myles brings this claim individually and on behalf of the North Carolina subclass, and plaintiff Myles has standing to bring this claim because she is and at all times relevant was a resident of North Carolina subject to the protection of the North Carolina Unfair and Deceptive Acts and Practices Act (the "NCUDTPA").

220.     The NCUDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."

221.     Defendants advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by the NCUDPTA. *See* N.C. Gen. Stat. Ann. § 75-1.1(b).

222.     Defendants engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, including:

        a.     Representing to plaintiff Myles and members of the North Carolina subclass their willingness to disburse SBA-approved loans by delivering to plaintiff Myles and members of the North Carolina subclass copies of the Note for their signatures, and accepting the signed Notes; and

        b.     Omitting, suppressing, and concealing the reasons why loans to plaintiff Myles and members of the North Carolina subclass had not been disbursed.

223.     Defendants' conduct constitutes "deceptive acts" in violation of the NCUDTPA.

224.     Defendants' conduct constitutes "unfair acts" in violation of the NCUDTPA.

225.     Defendants' representations and omissions and acts and omissions were material because they were likely to deceive reasonable consumers about their ability to secure SBA-

approved loans from defendant CPF, and to preclude plaintiff Myles and other members of the North Carolina subclass from seeking PPP loans from other lenders.

226.    Defendants intended to mislead plaintiff Myles and members of the North Carolina subclass and induce them to rely on their misrepresentations and omissions.

227.    Had CPF which was controlled and dominated at all material times by defendant Crossroads disclosed its intention to withhold the loan proceeds due to plaintiff Myles and members of the North Carolina subclass, plaintiff Myles and the members of the North Carolina subclass would not have done business with CPF. Plaintiff Myles and members of the North Carolina subclass acted reasonably in relying on CPF's misrepresentations and omissions and acts and omissions in failing to fund their PPP loans, the truth of which they could not have discovered before they were contractually bound to CPF, and thereby exclusively reliant upon CPF's good faith in actually funding their SBA-approved PPP loans.

228.    Defendants acted intentionally, knowingly, and maliciously to violate the NDUDTPA, and recklessly disregarded plaintiff Myles' and North Carolina subclass members' rights.

229.    Plaintiff Myles and members of the North Carolina subclass have suffered ascertainable losses of money or property, and monetary and non-monetary damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

230.    Plaintiff Myles and members of the North Carolina subclass seek all monetary and non-monetary relief allowed by law under the NCUDTPA, including actual damages, treble damages, restitution, and attorneys' fees and costs.

## **Prayer for Relief**

Plaintiffs, individually and on behalf of the proposed Class and subclasses as applicable, respectfully request the following relief:

A.      an order certifying the Class and subclasses under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiffs as representative of the proposed national Class; naming plaintiffs Covarrubias and Myles as representatives of the proposed California and North Carolina subclasses, respectively; and naming Plaintiffs' attorneys as counsel for the Class and subclasses;

B.      judgment in favor of Plaintiffs and the Class and subclasses on all applicable counts asserted herein;

C.      an award of compensatory, consequential and other damages to Plaintiffs and members of the Class and subclasses in amounts to be determined at trial to the maximum extent permissible by law, plus prejudgment interest;

D.      an accounting of all PPPLF advances CPF obtained for PPP lending and any other federally-guaranteed proceeds CPF obtained for PPP lending, including the whereabouts of any such proceeds they were not disbursed to SBA-approved borrowers, whether any such proceeds were paid by CPF to Crossroads and/or any other person or entity, the amounts of such payments, the identities of the recipients, and the date such proceeds were paid;

E.      an accounting of all PPP lender processing fees CPF and/or Crossroads obtained, including for PPP loans it ultimately funded and for PPP loans it did not fund;

F.      an order of all other forms of monetary relief to the maximum extent permissible by law, including payment to Plaintiffs and the Class and subclasses of all PPP loan proceeds owed and due to Plaintiffs and the members of the Class and subclasses with interest, as well as

disgorgement of all fees CPF and/or Crossroads obtained in connection therewith to the maximum extent permissible by law;

G.     an order requiring that Defendants, in the alternative and to the extent that Plaintiffs' breach of contract claim fails to adequately award Plaintiffs and the Class and subclasses their damages for the violations alleged herein, disgorge PPP loan fees and proceeds that they unjustly received and pay into a common fund for the benefit of Plaintiffs and the Class and subclasses;

H.     an award of punitive damages based on Defendants' intentional, wanton and malicious conduct, or its reckless disregard of Plaintiffs' and the Class members' rights, in amounts to be determined at trial to the maximum extent permissible by law;

I.     an order awarding Plaintiffs and the Class and subclasses their reasonable attorneys' fees and expenses and costs of this lawsuit, including but not limited to expert fees and costs, to the maximum extent permissible by law; and

J.     such other relief as the Court may deem just and proper.[2]

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

---

[2]     Plaintiffs file this Amended Complaint in accordance with the Court's Text Order on March 2, 2022, approving Plaintiff Greathouse's unopposed motion for an extension filed on March 2, 2022 (ECF 29).   Attached as Exhibit B is a redline comparing Plaintiff Greathouse's original complaint to this Amended Complaint.

Dated: March 28, 2022                    Respectfully submitted,

**FRIDAY, ELDREDGE & CLARK, LLP**
Katherine C. Campbell, AR Bar 2013241
Marshall S. Ney, AR Bar 91108
3350 S Pinnacle Hills Pkwy, Suite 301
Rogers, AR  72758
T:  (479) 695-6049
F:  (501) 244-5389
kcampbell@fridayfirm.com
mney@fridayfirm.com

By: _____
      Katherine C. Campbell

**AND**

**BAILEY & GLASSER LLP**
Lawrence J. Lederer (admitted *pro hac vice*)
Michael L. Murphy (admitted *pro hac vice*)
Bart D. Cohen (admitted *pro hac vice*)
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
T:  (202) 463-2101
F:  (202) 463-2103
llederer@baileyglasser.com
mmurphy@baileyglasser.com
bcohen@baileyglasser.com

**NOLAN HELLER KAUFFMAN LLP**
Justin A. Heller (admitted *pro hac vice*)
Matthew M. Zapala (admitted *pro hac vice*)
80 State Street, 11th Floor
Albany, NY 12207
T:  (518) 449-3300
F:  (518) 432-3123
jheller@nhkllp.com
mzapala@nhkllp.com

# Exhibit A

DocuSign Envelope ID  3424CDB9-3987-48B9-A86C-D846687B7A3F



## U.S. Small Business Administration
# NOTE

| SBA Loan # | 9988328700 |
|---|---|
| SBA Loan Name | Paycheck Protection Program |
| Date | 4/18/2021 |
| Loan Amount | $ 15665 |
| Interest Rate | 1.00% |
| Borrower | Eric Greathouse |
| Operating Company | Eric Greathouse |
| Lender | Capital Plus Financial |

1.   PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of

**$ 15665**_____ Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2.   DEFINITIONS:

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020), as amended by the Economic Aid Act, Pub. L. No. 116-269 (Dec. 27, 2020)

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower.

"PPP" means the Paycheck Protection Program under the CARES Act, including the rules, regulations and guidance of the SBA with respect thereto.

"SBA" means the Small Business Administration, an Agency of the United States of America.

DocuSign Envelope ID  3424CDB9-3987-48B9-A86C-D846687B7A3F

3.   PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

This Loan is made pursuant to the PPP. Borrower agrees that it will comply with all SBA guidance under the CARES Act and the PPP as it applies to this Loan, regardless when enacted or supplemented.

**Initial Deferment Period:** In accordance with the terms of the PPP, no payments are due on this Loan for ten (10) months from the date of first disbursement of this Loan. Interest will continue to accrue during the deferment period.

**Loan Forgiveness:** Loan payments will be deferred if the Borrower applies for forgiveness of this Loan until such time as Lender receives payoff of the Loan from the SBA. Borrower may apply to Lender for forgiveness under the PPP of the amount due on this Loan in an amount equal to the sum of the following allowable costs, as defined in more detail by the SBA, incurred by Borrower during the "Covered Period", which shall be between 8- and 24-weeks, beginning on the date of first disbursement of this Loan.

  a.   Payroll Costs

  b.   Any payment of interest on a covered mortgage obligation (which shall not include any prepayment of, or payment of, principal on a covered mortgage obligation)

  c.   Any payment on a covered rent obligation

  d.   Any covered utility payment

  e.   Any covered operating expenditures

  f.   Any covered uninsured property damage costs

  g.   Any covered supplier costs

  h.   Any covered worker protection expenditures

Subject to the eligible forgiveness amount determined by the SBA, any remaining principal and deferred interest will be amortized over the remaining term of this Note in equal monthly payments of principal and interest beginning on the eleventh (11th) month from the date of the end of the Covered Period. Lender shall provide the calculation of the monthly amortization amount to Borrower not later than ten (10) business days prior to the date on which the first payment is due.

If the Borrower seeks forgiveness under the PPP, it shall submit an application with supporting documentation in accordance with the PPP. If the Loan is not fully forgiven, Borrower will remain liable for the full and punctual payment and satisfaction of the remaining outstanding principal balance of the Loan plus accrued but unpaid interest.

**Maturity:** This Note will mature five (5) years from date of first disbursement of this Loan.

**Repayment Terms:** The interest rate on this Note is one percent (1.00%) per year, calculated on a non-adjustable, non-compounding basis. The interest rate is fixed and will not be changed during the life of the Loan.

Borrower must pay principal and interest payments every month, beginning the eleventh (11th) month from the date of end of the Covered Period.  Payments must be made on the first calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

All remaining principal and accrued interest is due and payable in five (5) years from first disbursement of this Loan.

**Loan Repayment:** Notwithstanding any provision in this Note to the contrary, Borrower may prepay this Note at any time without penalty.

**Non-Recourse:** Lender and SBA shall have no recourse against any individual shareholder, member or partner of Borrower for non-payment of the Loan, except to the extent that such shareholder, member or partner uses the Loan proceeds for an unauthorized purpose.

DocuSign Envelope ID  3424CDB9-3987-48B9-A86C-D846687B7A3F

4.  DEFAULT.

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company

A.  Fails to do anything required by this Note and other Loan Documents;

B.  Defaults on any other loan with Lender;

C.  Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

D.  Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

E.  Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

F.  Fails to pay any taxes when due;

G.  Becomes the subject of a proceeding under any bankruptcy or insolvency law;

H.  Has a receiver or liquidator appointed for any part of their business or property;

I.  Makes an assignment for the benefit of creditors;

J.  Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower 's ability to pay this Note;

K.  Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender 's prior written consent; or

L.  Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note

5.  LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A.  Require immediate payment of all amounts owing under this Note;

B.  Collect all amounts owing from the Borrower; or

C.  File suit and obtain judgment

6.  LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A.  Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document If Among other things, the expenses may include reasonable attorney's fees and costs. Lender incurs any such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

B.  Transfer or sell this Note;

C.  Release anyone obligated to pay this Note; and

D.  Take any action necessary to collect amounts owing on this Note.

7.  WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

8.  SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9.  GENERAL PROVISIONS:

A.  All individuals and entities signing this Note are jointly and severally liable.

B.  Borrower waives all suretyship defenses;

C.  Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to comply with SBA requirements pursuant to the CARES Act and the PPP;

D.  Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them;

E.  Borrower may not use an oral statement of Lender or SBA that contradict or alter the written terms of this Note.

F   If any part of this Note is unenforceable, all other parts remain in effect;

G.  To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee.

10  ASSIGNMENT; AGREEMENT TO MAKE CHANGES TO THIS NOTE.

This Note is assignable by Lender in whole or in part without the consent of Borrower (including, without limitation, any assignment to SBA or any third-party at SBA's direction) and is assignable by Borrower with the written consent of Lender. Borrower acknowledges that in order to disburse the loan proceeds to Borrower at the earliest possible time, Lender has prepared this Note based on its current understanding of the PPP. Borrower agrees that, if Lender deems it necessary or appropriate to amend this Note in any respect in order for this Note to comply with the PPP or for the SBA to guarantee all or any portion of the amounts outstanding under this Note, Borrower will sign and deliver to Lender any amendment to this Note or a new note in replacement of this Note, with the terms of any amendment or new Note retroactive to the date of this Note. Borrower will also execute any additional documentation the Lender or SBA requests that Lender or SBA believes is consistent with the purposes of the PPP.

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

1   STATE-SPECIFIC PROVISIONS

Unless otherwise prohibited by law, the following additional provisions will apply

Release of Lender. In consideration of the agreement of the Lender to provide this Note, and other good and valuable consideration, which consideration is agreed by Borrower to be good and sufficient. Borrower RELEASES, ACQUITS AND FOREVER DISCHARGES the Lender, its directors, officers, shareholders, agents, contractors, employees, affiliates, attorneys, successors and assigns from any and all claims, demands, liens, damages, actions or suits, of whatsoever nature or character, whether statutory (including without limitation usury and deceptive trade practices claims), in contract or in tort, known or unknown, which have accrued or may accrue to Borrower or any creditor or affiliate of Borrower on account of any injuries, damages or losses or otherwise arising out of or in any way connected to (i) any extension of credit by the Lender to Borrower on or prior to the date hereof, or (ii) any matter or thing done, omitted or suffered to be done by the Lender, its directors, officers, shareholders, agents, employees, affiliates, attorneys, predecessors or assignors on or prior to the date hereof

Notwithstanding anything else contained herein, this Note is not secured and there are no guarantors

DocuSign Envelope ID  3424CDB9-3987-48B9-A86C-D646687B7A3F

12.   BORROWER 'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

**BORROWER:** Eric Greathouse

By _____

By _____

By _____

By _____

DocuSign Envelope ID 3424CDB9-3987-48B9-A86C-D846687B7A3F

### ADDITIONAL AND CORRECTION DOCUMENTS AGREEMENT
### (ERRORS AND OMISSIONS AGREEMENT)

**RE:**   **Loan by Lender, Capital Plus Financial, LLC to** Eric Greathouse _____, a(n)

Independent Contractor _____, **in the amount of $** 15665 _____.

In consideration of Capital Plus Financial, LLC, located at 2247 Central Drive, Bedford, Texas 76021, (hereinafter called "Lender") making the above loan, each of the undersigned, jointly and severally, do hereby agree as follows:

1.   In the event the promissory note or any other document or other writing evidencing, securing or pertaining to the above loan is misplaced or lost or incorrectly reflects the true and correct terms, conditions or provisions of the loan in the opinion of Lender, each of the undersigned shall execute, acknowledge, initial and deliver to Lender all documents and other writings that Lender requests which Lender deems necessary to replace or correct any misplaced, lost or incorrect document or other writing; and

2.   In the event Lender deems it necessary that any additional documents or other writings be executed by any of the undersigned in connection with or pertaining to the above loan which have not been requested to be executed by the undersigned on or before the date hereof (or which were requested but not executed for any reason whatsoever), each of the undersigned shall execute, acknowledge, initial and deliver to Lender all such additional documents or other writings that Lender may reasonably request in connection with such loan; and

3.   Each of the undersigned further agrees to execute, acknowledge, initial and deliver to Lender all such documents and writings and pay such additional sums requested by Lender within ten (10) days after Lender requests same. Any request by Lender shall be deemed given and received on the earlier of (i) the date such request is actually received by one of the undersigned or (ii) three (3) days after such request is mailed, postage prepaid and addressed to any of the undersigned at the last known address of the undersigned in accordance with the records of Lender, whichever date occurs first; and

4.   If any of the undersigned refuses or fails within such ten (10) day period to (i) execute, acknowledge, initial and deliver any such document or other writing requested by Lender, or (ii) pay any such fees, expenses, costs or interest, each of the undersigned, jointly and severally, agree to pay to Lender all losses, damages and expenses paid or incurred by Lender in any manner emanating therefrom or connected therewith, including (but not limited to) reasonable attorney's fees, and each of the undersigned further agree that any such failure or refusal shall constitute a default and an Event of Default under the note and all other writings evidencing, securing or pertaining to said loan; and

5.   Each of the undersigned hereby acknowledges that Lender is relying upon this agreement in making the above loan and that Lender would not make such loan unless each of the undersigned execute and deliver this agreement; and each of the undersigned further agree that this agreement (i) shall inure to the benefit of Lender and each subsequent holder of the note evidencing such loan, and (ii) shall be binding upon each of the undersigned and upon each of the heirs, personal representatives, successors and assigns of each of the undersigned.

EXECUTED  4/18/2021

**BORROWER:**

Eric Greathouse _____.

A(n)              Independent Contractor

By: _____

Name: Eric Greathouse _____

Title: Owner _____

DocuSign Envelope ID  3424CDB9-3987-48B9-A86C-D846687B7A3F

**BUSINESS PURPOSE STATEMENT**
**(SBA Paycheck Protection Program)**


I, Eric Greathouse _____ , Owner _____ of  Eric Greathouse _____ .

a(n) _____ Independent Contractor _____ , state as follows:


1.    To induce Capital Plus Financial, LLC, 2247 Central Drive, Bedford, Texas 76021, to

extend credit to Eric Greathouse _____ , a(n) _____ Independent Contractor __ ,

I represent that the proceeds of the loan in the amount of $ 15665 _____ will   be   used

only for the following purpose(s):


Business related purposes as authorized by the U.S. Small Business Administration Paycheck
Protection Program and as specified in the loan application.

2.    I understand that the above-stated purpose is for business or commercial purposes only

and that you are relying upon these representations in not making Truth-in-Lending disclosures pursuant

to 15 U.S.C. Section 1601, in connection with this loan.


EXECUTED  4/18/2021


DocuSigned by:

_____
(Authorized Person)

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

## NOTICE - NO ORAL AGREEMENTS

**RE:** Loan by Lender, Capital Plus Financial, LLC to Borrower, Eric Greathouse _____,

      a(n)_____ Independent Contractor _____, in the amount of $ 15665 _____.

## THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE

## PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR

## SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

### THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

"Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods, or another thing of value or to otherwise extend credit or make a financial accommodation.

    **EXECUTED** 4/18/2021

**LENDER:**

CAPITAL PLUS FINANCIAL, LLC

By: _____

Name: **Farzana Giga** _____

Title: **CFO** _____

**BORROWER:**

Eric Greathouse

A(n)                Independent Contractor

By: _____

Name: **Eric Greathouse** _____

Title: **Owner** _____

DocuSign Envelope ID  3424CDB9-3987-48B9-A86C-D846687B7A3F

## WRITTEN CONSENT OF GOVERNING BODY
### (SBA PPP loan)

Pursuant to applicable law, the undersigned, being the appropriate governing body pursuant to the governing documents for the borrowing entity designated on the signature page hereof ("Company"), hereby consent to the adoption of and do hereby adopt the following resolutions and acknowledge that Capital Plus Financial, LLC ("Lender") is relying on the effectiveness hereof in making a loan to Company under the Paycheck Protection Program Second Draw Loans of the Small Business Administration ("SBA") as authorized under Section 311 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act ("Economic Aid Act"):

**RESOLVED**, that the undersigned hereby authorizes the Authorized Person named below as the appropriate person pursuant to the governing documents of the Company ("Authorized Person"), for and on behalf and in the name of the Company, to take such action necessary for the Company to borrow money and to obtain credit from the Lender, with its principal office located in Dallas, Texas, in the amount stated in the promissory note executed by Company and payable to Lender (the "Loan") and dated on or about the date hereof, hereinafter called the "Loan", including any renewals, extensions, consolidations or rearrangements of such indebtedness, upon such terms and at such rates as he or she deems reasonable;

**BE IT FURTHER RESOLVED**, that the undersigned hereby authorizes the Authorized Person, for and on behalf and in the name of the Company to prepare, execute and deliver any and all applications, certifications, promissory notes, loan agreements and any and all other documents and to perform any and all acts which may be necessary or proper to effect the borrowing and to execute and deliver any and all instruments and perform any and all acts required by the Lender and/or the SBA in connection with any matters herein contained, including any renewals, extensions, consolidations or rearrangements of such indebtedness, upon such terms and at such rates as the Authorized Person, in his or her sole discretion, deems reasonable;

**BE IT FURTHER RESOLVED**, that all the acts and deeds done or to be done by the Authorized Person, in connection with the execution and delivery of any promissory notes, loan agreements, and any and all other documents, and any and all acts which may be necessary or proper to effect the borrowing, are hereby authorized, adopted, ratified, confirmed and approved as the acts and deeds of Company;

**BE IT FURTHER RESOLVED**, that the Authorized Person be and is hereby authorized and directed to take such other action and deliver such additional instruments in the name of and on behalf of Company, or otherwise to do all such further acts and things that the Authorized Person shall deem necessary or proper in order to effectively perform all of the obligations and agreements expressed to be kept and performed by Company, pursuant to the provisions of any promissory notes, loan agreements and any and all other documents and to perform any and all acts which may be necessary or proper to effect the borrowing described above;

**BE IT FURTHER RESOLVED**, that any government agency, including but not limited to, the SBA, may also rely on this Written Consent when identifying any Authorized Person for purposes of any loan guaranty, loan forgiveness, or other government program related to the Loan; and

**BE IT FURTHER RESOLVED**, that any and all acts authorized pursuant to this Written Consent and performed prior to the execution of this Written Consent are hereby ratified and approved. This Written Consent shall be continuing and shall remain in full force and effect until written notice of its revocation shall have been delivered to the Lender and receipt acknowledged by the Lender in writing.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK - SIGNATURES ON FOLLOWING PAGE]**

DocuSign Envelope ID  3424CDB9-3987-48B9-A86C-D846687B7A3F

**IN WITNESS WHEREOF,** the undersigned have executed this consent effective as of  4/18/2021

AUTHORIZED PERSON:

Eric Greathouse

A(n)                              Independent Contractor

By:      _____

Name:    Eric Greathouse

Title:    Owner

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

| Form **W-9**<br>(Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification**<br><br>▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | **Give Form to the<br>requester. Do not<br>send to the IRS.** |

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Eric Greathouse

**2** Business name/disregarded entity name, if different from above

Eric Greathouse

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☒ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

2103 W 5th St

Requester's name and address (optional)

**6** City, state, and ZIP code

Russellville          AR          72801

**7** List account number(s) here (optional)

---

**Part I**  **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

**Employer identification number**

---

**Part II**  **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**  Signature of U.S. person ▶ *[signature]*  Date ▶ 4/18/2021

1514472B1B3404

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Cat. No. 10231X                    Form **W-9** (Rev. 10-2018)

DocuSign Envelope ID: 3424CDB9-3987-48B9-A86C-D846687B7A3F

**Information and Bank Account Certification and Authorization:**

I acknowledge that the lender has to its best ability confirmed the ownership and active status of the depository account at the Financial Institution listed as required in the documents submitted to the SBA for PPP loan approval. I understand, acknowledge, and agree that the Lender or its' partners can share any financial information that I have provided with along with the SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, or any of its affiliates or partners for the purpose of compliance, accuracy, and verification of good standing to comply with all SBA Loan Program Requirements and or any and all SBA reviews.

I, Eric Greathouse_____ certify in good faith to the below information to be the rightful and correct owner of the account and am responsible for the accuracy and information provided below and authorize the lender and or its affiliates or partners to deposit the loan proceeds on the company's behalf. I further certify that the account information provided below is true and accurate in all material respects.

BANK NAME:   Evolve Bank & Trust

ACCOUNT NAME:  Eric Greathouse

ACCOUNT NUMBER: ███████████

ROUTING NUMBER:  084106768

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
~~CENTRAL DIVISION~~

**CENTRAL DIVISION**

| | |
|---|---|
| ERIC GREATHOUSE, ERNESTO COVARRUBIAS, TIFFANY SUMRALL and BARBARA MYLES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CAPITAL PLUS FINANCIAL, LLC and CROSSROADS SYSTEMS, INC.,<br><br>Defendants. | Case No. ——————————4:21-cv-1243-BRW<br><br>~~COMPLAINT~~ AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

~~Plaintiff~~Plaintiffs Eric Greathouse ("~~Plaintiff" or "~~Greathouse"), Ernesto Covarrubias ("Covarrubias"), Tiffany Sumrall ("Sumrall") and Barbara Myles ("Myles") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, ~~files~~file this Amended Class Action Complaint for damages, an accounting, and equitable relief against Capital Plus Financial, LLC ("CPF") and CPF's corporate parent, Crossroads Systems, Inc. ("Crossroads" and, together with CPF, "Defendants"), for failure to fund U.S. Small Business Association (the "SBA")-approved Paycheck Protection Program ("PPP" or the "Program") loans that CPF was contractually obligated to fund. In support, ~~Plaintiff makes~~Plaintiffs make the following allegations based upon information and belief except as to the allegations pertaining to ~~the Plaintiff.~~themselves which are based on personal knowledge. ~~Plaintiff's~~Plaintiffs' information and belief is based on the ongoing investigation of ~~his undersigned~~their counsel~~.~~ which included, among other things, a review of applicable documents, information from other litigation against

Defendants and one of Defendants' senior executives, publicly available information concerning the PPP and PPP loans, filings with the U.S. Securities and Exchange Commission (the "SEC")"), and media and other reports available on the Internet.

## **Summary of the Claims**

1.      Following the worldwide outbreak of COVID-19, Congress passed the Coronavirus Aid, Relief and Economic Security Act ("(the "CARES Act") to, among ~~many~~ other things, provide some relief to America's small businesses and sole proprietors through the ~~establishment~~creation of the PPP.

2.      Administered by the United States Small Business Administration ("SBA"), the PPP was established to provide hundreds of billions of dollars of potentially forgivable loans to small businesses and sole proprietors in a quick and efficient manner using the same standard form note and accompanying loan agreement documents that Plaintiffs and other PPP borrowers entered into with CPF.

3.      To ensure that small businesses and sole proprietors received PPP loan proceeds quickly, the applicable provisions of the PPP required lenders to fund PPP loans within ten days of SBA approval.

4.      Lenders that participated in the Program were entitled to fees payable by the SBA for each PPP loan the lenders processed.

5.      Defendant CPF was one of the SBA's authorized PPP lenders.

6.      Before the PPP, CPF was a small lender in the Texas area with less than $40 million in total revenue in fiscal year 2020.

7.      Defendant CPF is, or at all times relevant in 2021 was, defendant Crossroads's only operating subsidiary. Crossroads is a publicly-traded for-profit holding company. CPF is,

and at all times relevant in 2021 was, controlled and dominated by Crossroads; shared certain of the same senior executives; had a website that referenced and promoted Crossroads and provided links to Crossroads's website; was referred to in Crossroads's SEC filings and other public statements as one and the same company; and was operated by Crossroads as if they were one and the same company.

8.   In 2021, after the SBA substantially increased the fees lenders would receive for PPP loans made that year in 2021, Crossroads caused CPF to exploit that increased fee opportunity by dramatically ramping up its participation in PPP lending. It was hugely successful in that respect.

5.9.   In particular, CPF reportedly processed 472,036 PPP loans totaling over $-7.5 billion through May 31, 2021 –-- the second most PPP loans by any other lender in 2021, and more than the total number of PPP loans made in 2021 by Bank of America, PNC Bank, TD Bank and Wells Fargo combined. See Paycheck Protection Program (PPP) Report: Approvals through 05/31/2021, at p.7, available at https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf See Paycheck Protection Program (PPP) Report: Approvals through 05/31/2021, at p.7, available at https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf (last accessed Sept. 21, 2021).

10.   As a result, Although only CPF and/or its corporate parent, the publicly-traded, for-profit company not Crossroads. reportedly was the SBA-qualified PPP lender. Crossroads was the alter ego of CPF, and thus CPF upstreamed all or the vast bulk of its PPP lending fees directly to Crossroads.

6.11.   Accordingly, in its SEC filings, Crossroads reported that "the Company" received $970.5 million in total revenue of which $930 million in was PPP loan fees in 2021. In fact,

3

though not an SBA-approved PPP lender, Crossroads compared to just $27.5 million in total revenue the prior year. As stated in its*Crossroads's* quarterly report filed with the SEC for the period ending July 31, 2021 as follows:

> "Total revenue from operations for the nine months ended July 31, 2021, was $970.5 million compared to $27.5 million for the same period of 2020. The increase in revenue was the result of *the Company* participating in the Payment Protection Program (PPP) administered by the Small Business Administration ("SBA").("SBA"). *The Company* earned fees from the program totaling approximately $930.0 million."

*See* http://www.crossroads.com/wp-content/uploads/2021/09/CRSS_Q3-2021-OTC-Disclosure-Statement.pdf (accessed Dec. 23, 2021) (emphasis added).

7.12.   In flagrant disregard of its contractual loan agreement obligations to PlaintiffPlaintiffs and the other eligible class member borrowers, however, CPF failed to actually fund those borrowers' SBA-approved PPP loans.

8.13.   PlaintiffPlaintiffs and numerous other business owners across the country each timely applied for PPP loans with CPF, had their loans approved by the SBA and assigned PPP loan numbers, and yet never received their PPP loan funds.

14.   Further, and forFor its role in owning and controlling CPF and in directing the conduct and exploiting CPF's status as an SBA-approved PPP lender, Crossroads not only received hundreds of millions of dollars in PPP loan fees — including loan fees on the backs of the PPP loans of Plaintiffs and other putative borrower members of the proposed class across the country that CPF never funded—and, in turn, distributed millions of dollars in such feesfailed to fund. It also, less than two months from when the PPP lending window closed on May 31, 2021, announced that as a result of its corporate insiders"windfall associated with the PPP loan program" it was "now overcapitalized" and would pay out a special dividend of $40 per share to shareholders of record as of July 19, 2021 totaling over $238 million, $157 million of which was

rushed out and paid to the handful of senior executives and directors of Defendants who, collectively, then owned approximately 66% of Crossroad's Crossroads's equity.

9.15.   In sum, while purporting to "promote economic vitality and community development" and "'hav[ing] seen firsthand the impact that the pandemic has had on minority-owned businesses in low-to-moderate income tracts'" as Crossroads stated in its January 11, 2021 news release (*see* Capital Plus Financial Partners with Blueacorn to Expedite PPP Loan Relief to Small Businesses - Jan 11, 2021), Defendants and their senior executives shamelessly enriched themselves off the backs of PPP loans to which Plaintiffs and other class member borrowers were contractually entitled but CPF failed to fund.

### Parties

10.16.  Plaintiff Greathouse, a natural person residing in Russellville, Arkansas, is a sole proprietor of an insurance inspection business.

17.     Plaintiff Covarrubias, a natural person residing in Santee, California, is a sole proprietor of an auto repair business.

18.     Plaintiff Sumrall, a natural person residing in El Paso, Texas, is a sole proprietor of a landscape architectural business.

19.     Plaintiff Myles, a natural person residing in Raeford, North Carolina, is a sole proprietor of a business involving independent artists, writers and performers.

11.20.  Defendant CPF is a limited liability company organized under the laws of the state of Texas with its principal place of business at 2247 Central Drive, Bedford, Texas 76021.

12.21.  Defendant Crossroads is a corporation organized under the laws of Delaware with its principal place of business at 4514 Cole Avenue, Suite 1600, Dallas, Texas 75205.

**Jurisdiction & Venue**

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the aggregate amount in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states. This Court also has jurisdiction under the Class Action Fairness Act because at least one member of the proposed class is a citizen of a different state than defendant CPF; there are more than 100 members of the proposed class; and the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2)(A).

23.     Defendants' motion to dismiss contends that plaintiff Greathouse's initial complaint "fail[ed] to plead that Defendants' conduct relating to the claims he asserts in this case created any connection with Arkansas, and, indeed, *no such connection exists*." Dkt. 25 at ECF p. 8 (emphasis added). Defendants are incorrect because they have many connections here.

24.     As a threshold matter, Defendants premise their challenge to personal jurisdiction on a single self-serving declaration (ECF 24-1), and assert exclusively facts regarding what they did *outside* Arkansas. In doing so, Defendants would have the Court ignore entirely other *publicly available* facts they omit which clearly demonstrate, even at this pleading stage without the benefit of *any* discovery, that Defendants purposefully availed themselves of, and benefitted directly from, substantial business in Arkansas and this judicial District at all relevant times concerning the claims at issue.

25.     This Court has personal jurisdiction over defendant CPF because CPF had substantial and direct contacts in this District by virtue of its entering into its agreement to fund plaintiff Greathouse's PPP loan; by entering into PPP loan agreements with thousands of other PPP borrowers in this District; by committing to fund the PPP loans under the contractual loan

6

agreements it entered into with plaintiff Greathouse and other PPP borrowers in this District; by its loan and borrower review and underwriting activities Defendants *admit* accompanied, and were a part of, each such PPP loan, including the thousands of loans to borrowers in this District; by its obtaining PPP lender fees from PPP loans committed to borrowers in Arkansas and this District; by virtue of ongoing PPP loan advance reporting requirements to the SBA *directly in* this District concerning the PPP loans of borrowers *not only* in this District and Arkansas, *but also* borrowers from *23 other* states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands; and by virtue of its communications and activities it undertook in this District with the SBA relating to many of the PPP loans, PPP loan forgiveness, interest on PPP loans and PPP loan fees at issue in this case.

26.     More particularly, and for further detail, although Defendants' motion to dismiss implies it did business in this District only with plaintiff Greathouse, CPF in fact committed to fund at least 2,134 separate SBA-approved PPP loans in 2021 for qualified borrowers residing in this District alone, for total PPP loan proceeds of at least $32,770,618.00 according to the SBA's own publicly-available PPP loan data. *See* website https://data.sba.gov/dataset/ppp-foia (public_up_to_150k_1_220102.csv). In addition, and also based on the SBA's publicly available SBA PPP loan data, CPF committed to fund at least 2,578 separate SBA-approved PPP loans in 2021 for qualified borrowers residing in the State of Arkansas, for total PPP loan proceeds of at least $38,715,478.00. *Id.*

27.     Assuming that each such PPP loan generated PPP loan processing fees of *at least* $2,500.00 per loan, this means that CPF obtained at least $5,335,000.00 in total PPP loan fees on the backs of resident business owners located directly in this District (2,134 x $2,500.00), and

7

$6,895,000.00 in total PPP loan fees from loans to resident business owners in Arkansas (2,578 x

$2,500.00).

      28.      In connection with each of the thousands of PPP loan agreements and millions of

dollars in lender processing fees with borrowers in this District, CPF purposefully availed itself

of substantial and direct business activity in this District sufficient to subject itself to the personal

jurisdiction of this Court. In fact, for each such PPP loan, CPF's role was not limited to entering

into the loan agreement contracts and funding the loans for Plaintiffs and other putative class

member borrowers.

      29.      In addition, CPF's role as the SBA-approved lender of PPP loans required it to

underwrite and review each PPP loan individually, wherever the borrower was located.

Defendants even admit that CPF had to review each such loan and apply its underwriting

requirements to each such loan. *See, e.g.*, ECF 25 at ECF p. 16 ("CPF's role in PPP lending is

thus limited to *applying its own internal underwriting requirements to loan applications …*,

making a decision of whether to fund loan, and then ultimately funding the loan if appropriate.")

(emphasis added). Similarly, in other currently pending litigation involving a claim that

Defendants failed to share PPP lender processing fees with one of its agents, Defendants stated

the following regarding CPF's underwriting obligations as to each PPP loan:

> "The lender, however, must do some basic 'underwriting.' Specifically, the PPP
> Regulations contain a section titled, "What do lenders have to do in terms of loan
> underwriting?" [86 Fed. Reg.] at 3707–08. The regulations enumerate four
> 'underwriting' steps:
>
> (1)     confirm receipt of the borrower certifications in the Form 2483
>         application;
>
> (2)     confirm receipt of documentation showing employment status of the
>         applicant or if a business, documents showing employees as of February
>         2020;

(3)    confirm the historic payroll (if the applicant had employees) by examining the documentation submitted; and

(4)    comply with the Bank Secrecy Act ("BSA") or similar anti-money laundering procedures, such as a customer identification program ("COP"), designed to make sure the lender confirms the identity of the applicant.

*Id.* In addition to the above steps, the lender was obligated to 'review' each application. *Id.* at 3708 ('Each lender's underwriting obligation under the PPP is limited to the items above and reviewing the 'Paycheck Protection Borrower Application Form.').''

Quoting Defendants' Memorandum of Law in *Oto Analytics, Inc. d/b/a Womply v. Capital Plus Financial, LLC, et al.,* Case No. 3:21-cv-2636-B (N.D. Tex.) (ECF 43 at ECF pp's 9-10).

30.    Further, Defendants' attempt to argue that they outsourced and relied on third-party PPP agent firms and thereby were distanced from actively undertaking its own underwriting and review obligations (*see* ECF 25 at ECF pp's. 15-16), is contradicted by Crossroads's own statements to shareholders in describing its involvement in PPP. For example, in a letter accompanying Crossroads's report to shareholders for the three months ended April 30, 2021, Crossroads's Chairman Robert Alpert and Crossroads's and CPF's then dual CEO and Crossroads Board member Eric Donnelly stated that "[t]hough we leaned heavily on our loan service providers for support on the front end, *we were thorough in reviewing applications on the back end.* Whereas most lenders use one to two layers of identity verification and customer compliance mechanisms, we used four. This investment in KYC ('knowing your customers') substantially reduced fraud, which is evidenced by a negligible rate of active fraud cases of less than .25bps." (emphasis added).

31.    This Court has personal jurisdiction over defendant CPF by virtue of the underwriting and review process that CPF necessarily had to do as to each PPP borrower in this

District, including but not limited to plaintiff Greathouse and the thousands of additional PPP borrowers in this District.

32.     The Court also has personal jurisdiction over defendant CPF also by virtue of CPF's substantial and direct connections to, and communications and activities regarding PPP lending with, the SBA Commercial Loan Service Center *located directly in this District* -- some *three miles from this Court and the offices of one of Defendants' counsel*.

33.     Again although omitted from Defendants' motion to dismiss, the SBA has two Commercial Loan Service Centers in the United States that service all of the SBA's commercial loans, one in Fresno, California that services business primarily in the western half of the United States, and the other *actually located in Little Rock, Arkansas* at 2120 Riverfront Drive, that services business primarily in the eastern half of the United States. *See* https://www.sba.gov/LittleRockCLSC. The SBA's Little Rock Commercial Loan Service Center "was created in 1995 to centralize the servicing of SBA's 7(a), 504 Debenture and Disaster Business loans for Regions 1-4 (Eastern Seaboard) and most of Region 6 (Central Southern States Oklahoma and Texas)"; "covers 24 states, the District of Columbia as well as Puerto Rico and the US Virgin Islands"; and "is one of two Centers nationwide that *handles all of SBA's commercial loans*." *See* https://www.sba.gov/content/mission-clsc-ar (emphasis added).

34.     The SBA's Little Rock Commercial Loan Service Center *includes Texas-based qualified PPP and other SBA-approved lenders including CPF. See* https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20091%20-%202nd%20Updated%20PPP%20Processing%20Fee%20and%201502%20Reporting-508.pdf at 6 n. 4 ("The geographic coverage of the Fresno Servicing Center is SBA Regions 5, 6 (except for

Arkansas, Oklahoma and Texas) 7, 8, 9, and 10. The geographic coverage of the Little Rock Servicing Center is SBA Regions 1, 2, 3, 4, and 6 (except New Mexico and Louisiana)."

35.     PPP and PPP lending was part of the SBA's commercial loan servicing. In connection with the PPP and PPP lending, CPF engaged in substantial and direct communications with personnel in the SBA's Little Rock Commercial Loan Service Center regarding PPP loan applicants, SBA-approved borrowers including Plaintiffs and the other putative members of the proposed class, PPP lender fees and other aspects of the PPP. The SBA even directed that questions relating to aspects of PPP lending should be made to either of the two Service Centers. *See, e.g.,* https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20091%20-%202nd%20Updated%20PPP%20Processing%20Fee%20and%201502%20Reporting-508.pdf at p. 6 ("Questions on voluntary termination can be emailed to: For the Fresno Servicing Center: fsc.servicing@sba.gov; for the Little Rock Servicing Center: lrsc.servicing@sba.gov.").

36.     CPF accordingly communicated substantially and directly with personnel from the Little Rock Commercial Loan Service Center not only in connection with the PPP loans of plaintiff Greathouse and other SBA PPP borrowers residing directly *in* this District, but also in connection with PPP borrowers from the additional 23 states and other territories within the SBA's Little Rock Commercial Loan Service Center coverage areas -- which, collectively, represents many thousands of additional SBA-approved borrowers, including Plaintiffs and numerous other similarly situated SBA-approved but unfunded borrowers of the proposed class.

37.     Although these facts demonstrate that CPF has sufficient contacts in this District relating to the PPP lending at issue, jurisdictional discovery regarding CPF's and likely both Defendants' direct dealings and communications with borrowers in this District and with the

11

SBA Little Rock Servicing Center and the lender processing fees CPF generated thereby will provide additional evidence regarding the substantial and direct business Defendants did at all relevant times in this District.[1]

13.38.  The Court has personal jurisdiction over defendant Crossroads because Crossroads controlled and directed CPF's conduct in PPP lending even though only CPF was the SBA-approved and qualified PPP lender; Crossroads directed CPF to, and CPF did, in fact, "upstream" to Crossroads the PPP loan processing fees CPF obtained from the PPP loans of Plaintiffs, class members and other borrowers as if Crossroads and CPF were one and the same company; Crossroads and CPF shared senior executives and overlapping websites that referred to each other; the shared executives of Crossroads and CPF participated directly or indirectly in the PPP lending process and in regularly communicating with personnel from the SBA's Little Rock Commercial Loan Service Center in connection with the PPP loans at issue; Crossroads's SEC disclosures and other statements referred to the companies as if they were one and the same; CPF was Crossroads's only operating subsidiary in 2021 and Crossroads was CPF's alter ego at all

---

[1]     Defendants moved on February 25, 2022 to basically stay discovery under the guise of extending the Court's scheduling deadlines pending the Court's ruling on their motion to dismiss, premised largely on their false contention that this Court lacks jurisdiction. *See* ECF 26, 27. The Court granted that motion by Order on March 2, 2022. *See* ECF 30. If the Court has any doubt it may properly exercise personal jurisdiction over both Defendants, Plaintiffs request they be permitted to take jurisdictional discovery concerning Defendants' contacts with the Little Rock Service Center regarding Plaintiffs' PPP loans and the PPP loans of other PPP applicants and borrowers within the Little Rock Service Center's coverage area; the total number of such applicants and borrowers of CPF and amounts of PPP proceeds and PPP lender processing fees at issue within that coverage area; the number of SBA-approved but unfunded class member PPP borrowers and total loan proceeds and the potential disposition by Defendants or whereabouts of those unfunded proceeds, including for unfunded borrowers in this District, Arkansas and other such borrowers within that coverage area; and the written and oral communications Defendants had with PPP borrowers in reviewing and underwriting PPP loan applications from borrowers in this District and the SBA coverage area. Jurisdictional discovery will further support Plaintiffs' allegations that the Court's exercise of personal jurisdiction over both Defendants in this case is fair.

times relevant in connection with all aspects of PPP lending; and CPF's contacts in this District in connection with the claims at issue are also imputed to its corporate parent Crossroads.

14.39.  Venue is proper in this judicial District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

### Additional Factual Allegations

**Background Concerning the
COVID-19 Pandemic and the PPP**

15.40.  On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a "pandemic." Two days later, on March 13, 2020, the United States declared a national emergency due to the COVID-19 pandemic.

16.41.  In response, on March 27, 2020, the United States Congress passed the largest economic stimulus package in the nation's history -- the CARES Act. The CARES Act amounted to over $2 trillion in aid, equivalent to roughly $6,000 per American, or 45% of all federal government spending for 2019.

17.42.  The CARES Act was enacted to provide immediate assistance to individuals, families, and businesses affected by the COVID-19 emergency.

18.43.  One facet of the CARES Act's approach to economic relief was the PPP. Recognizing the huge strain that the COVID-19 pandemic would likely impose on American small businesses, the PPP initially allocated $349 billion for loans to small businesses, sole proprietors, and nonprofit organizations, among others. These loans were intended to pay up to eight weeks of payroll costs (including benefits) and could also be used to pay interest on mortgages, rent, and utilities.

19.44.  PPP loans are guaranteed by the SBA, and the PPP provides for loan forgiveness if the borrower demonstrates that the funds were used in compliance with PPP regulations.

13

20.45.  The PPP has ~~been the subject of~~received several legislative renewals,

modifications, and extensions. On April 24, 2020, the President signed the Paycheck Protection

Program and Health Care Enhancement Act, which provided additional funding and authority for

the PPP. On June 5, 2020, the Paycheck Protection Program Flexibility Act of 2020 was enacted,

extending the deferral period for PPP loans, among other provisions. On July 4, 2020, the PPP

was further amended to guarantee PPP loans to August 8, 2020. On December 27, 2020, the

Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Economic Aid

Act") was enacted, which further extended the PPP and allowed for the SBA to authorize

second-draw PPP loans through March 31, 2021, available to borrowers who already used their

previous PPP loan proceeds for permitted expenditures. On March 11, 2021, the American

Rescue Plan Act was signed into law, adding an additional $7.25 billion for PPP loans, bringing

total appropriations for the program to $813.7 billion. Finally, on March 30, 2021, the PPP

Extension Act was enacted, which extended the PPP application deadline to May 31, 2021, and

gave the SBA until June 30, 2021 to process loan applications.

21.46.  PPP loans are generally available to businesses in operation as of February 15,

2020 that had paid employees, as well as self-employed individuals. Businesses receiving PPP

loans cannot have more than 500 employees and cannot be in bankruptcy. Further, applicants are

required to certify that the "current economic uncertainty makes this loan request necessary to

support the ongoing operations of the Applicant." Currently, at least 60% of the proceeds must

be used for payroll costs. The entire amount of any PPP loan is subject to forgiveness so long as

the proceeds are used for eligible expenses.

22.47.  Under the Economic Aid Act, a PPP borrower is entitled to a second draw under

narrower conditions than its first draw. For example, a second draw borrower must have 300 or

14

fewer employees, must demonstrate that it sustained a certain percentage reduction in its gross receipts compared to 2019, and must have used its entire first draw proceeds prior to disbursement of its second draw proceeds. Second draw loans -- like first draw loans -- are also subject to forgiveness.

23.48.  Given the anticipated volume of PPP loan applications, Congress provided for PPP loan processing and funding through private lenders, with the SBA paying these lenders a fee for each processed PPP loan.

24.49.  For their participation, the PPP originally provided that lenders would receive fees at a rate of five percent for loans $350,000.00 or less, three percent for loans between $350,000.00 and $2,000,000.00, and one percent for loans over $2,000,000.00. *See* SBA Procedural Notice, Control No. 5000-20091 (Feb. 8, 2021), available at https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20091%20-%202nd%20Updated%20PPP%20Processing%20Fee%20and%201502%20Reporting-508.pdf (last accessed Sept. 17, 2021).

25.50.  To address institutional lenders' neglectneglecting of PPP loan applications from many small businesses -- especially minority, underserved, veteran, and women-owned businesses -- in favor of larger PPP loans, the Economic Aid Act added that lenders processing loans of up to $50,000.00 would receive an increased fee of fifty percent or $2,500.00, whichever is less, per PPP loan beginning December 27, 2020.

26.51.  As the vast majority of PPP loans -- even those to the smallest businesses and sole proprietors -- exceeded $5,000.00, PPP lenders received a flat fee of $2,500 for virtually every PPP loan less than $50,000.00.

15

27.52.  On February 8, 2021, the SBA issued a new notice setting forth the procedure for how lenders would be paid PPP loan fees by the SBA. *Id.*

28.53.  To apply for a PPP loan, a prospective borrower would have to submit a standardized Borrower Application Form issued by the SBA (<u>SBA Form 2483</u> for first time borrowers and <u>SBA Form 2483-SD</u> for second draw borrowers), together with relevant payroll documentation, to a lender. Once the lender reviewed and approved the loan application, the lender would submit the application to the SBA for approval.

29.54.  Following SBA approval of an application, the SBA would issue a ten-digit loan identification number (known as a "GP [General Program] number") for the borrower's loan.

30.55.  Provided that the borrower had executed the loan documents, the lender was required to disburse the PPP funds within ten days of SBA approval and assignment of the loan number.

31.56.  If the PPP borrower did not sign and submit all of the required documents to the lender, then the PPP lender was required to report the loan and corresponding loan number as cancelled no later than twenty days from the SBA approval and assignment of the loan number.

32.57.  Lenders' compliance with the above PPP funding requirement was of paramount importance to applicants and borrowers for reasons beyond their need to get the PPP loan proceeds in a timely manner.

33.58.  Once the SBA approved a PPP loan and assigned it a loan number, the applicant could not apply for a PPP loan with any other lender because the applicant could not make all of the required certifications on another PPP loan application. Thus, once approved, the borrower was essentially bound to "stuck" with the lender to whom it applied for the PPP loan, inmeaning that the borrower had to rely exclusively on the good faith of the lender to actually fund the loan.

34.59.  For both first draw and second draw PPP loans, a PPP loan applicant had to certify that they had not and would not receive another first draw or second draw loan, respectively.

35.60.  Since the lender's obligation to fund a PPP loan ran from the date the SBA approved and assigned a loan number, an applicant could not certify to another lender that they would not receive the first loan even if the first lender had failed to timely fund the loan.

36.61.  Once a PPP loan was funded, the lender had ten days to submit an SBA Form 1502 to report to the SBA that the loan proceeds had been disbursed. After the lender submitted a Form 1502, the SBA would initiate payment of the processing fee to the lender.

37.62.  By submitting a Form 1502, the lender represented to the SBA that the PPP loan had been fully funded. Further, a lender was required to update the SBA with monthly Form 1502 reports detailing each PPP loan's status.

**Background Concerning Defendants CPF and Crossroads**

38.63.  CPF is a certified community development financial institution ("CDFI").

39.64.  CPF states on its website that it purports to "serv[e] the Hispanic community in the state of Texas." *See* http://www.crossroads.com/wp-content/uploads/2021/09/CRSS_Q3-2021-OTC-Disclosure-Statement.pdf (accessed Dec. 23, 2021).

40.65.  CDFIs were established as part of the Riegle Community Development and Regulatory Improvement Act of 1994. *See* What Are CDFIs, available at https://www.cdfifund.gov/sites/cdfi/files/documents/cdfi_infographic_v08a.pdf (last accessed Sept. 17, 2021). There are reportedly 1,000 CDFIs operating nationwide. *Id.*

41.66.  Although it is a CDFI, CPF was acquired by the for-profit, publicly-traded company Crossroads in 2017 (OTCQB: CRSS ).

17

42.67.  Crossroads states in media releases and on its website that it is a holding company that focuses on investing in businesses that promote economic vitality and community development. *See, e.g.*, https://capitalplusfin.com/in-the-news/.

43.68.  Since many sole proprietors' PPP loans were in amounts less than $10,000.00, PPP lenders were generating processing fees of only several hundred dollars for making those loans in 2020.

44.69.  Pursuant to the new 2021 increased fee schedule, however, lenders like CPF could count on collecting a $2,500.00 flat fee for every PPP loan less than $50,000.00.

45.70.  Taking into consideration the incredible demand for PPP loans less than $50,000.00 by sole proprietors, independent contractors, self-employed individuals and other underserved small businesses together with the more lucrative fee schedule, CPF (and its corporate parent Crossroads) saw an opportunity to generate enormous amounts of lender fees by booking a high volume of PPP loans under $50,000.00.

46.71.  CPF and/or Crossroads reportedly contracted with Blue Acorn PPP, LLC (and/or its affiliate, FinCap, Inc. or their affiliates) ("Blueacorn") in 2021 to help identify borrowers to whom CPF could make PPP loans and assist in the PPP paperwork process. Blueacorn reportedly, in turn, contracted with others such as Oto Analytics, Inc. d/b/a Womply ("Womply") to also help identify and assist additional potential PPP borrowers.

47.    Blueacorn was establishedcreated in 2020.

72.    Neither Blueacorn or Womply is neither a bank nor aor the SBA-qualified lender and, therefore, cannot actually make PPP loans.

48.73.  Defendants assert in their motion to dismiss that "CPF is committed to its borrowers' satisfaction and takes seriously any concerns that are raised about its services." ECF

25 at ECF p. 9. In truth, Defendants' PPP lending services have embroiled it not only in this litigation but also as noted above a separate lawsuit from its own direct or indirect partner, Womply, which alleges that both Defendants and one of their senior executives, Eric Donnelly ("Donnelly"), defrauded Womply out of its share of PPP lender processing fees and other payments. *See Oto Analytics, Inc. d/b/a Womply v. Capital Plus Financial, LLC, Crossroads Systems, Inc., Eric Donnelly, Ba Fin Orion, LLC d/b/a Blueacorn, and Barry Calhoun,* Case No. 3:21-cv-2636-B (N.D. Tex.). More specifically, Womply alleges that it referred 86,521 PPP loans to CPF totaling more than $950 million in total PPP loan proceeds that resulted in CPF receiving $186,882,946 in lender processing fees, but that defendants there actually committed fraud and conspired in failing to pay Womply its share of those and other fees.

49.74.  In general, only SBA section 7(a)-approved lenders were approved to make PPP loans, together with any additional lenders determined by the Administrator of the SBA and the Secretary of the U.S. Treasury to also be qualified to make such loans. *See* 86 Fed. Reg. 3692 (Jan. 14, 2021), available at https://www.federalregister.gov/documents/2021/01/14/2021-00451/business-loan-program-temporary-changes-paycheck-protection-program-as-amended-by-economic-aid-act (last accessed Sept. 17, 2021).

50.75.  Accordingly, ~~Plaintiff~~Plaintiffs and other similarly situated class member borrowers contracted with CPF as the lender obligated to make the PPP loans.

51.76.  For ~~its~~their role in identifying potential borrowers and helping with the PPP paperwork, Blueacorn, Womply and other PPP agent firms were reportedly ~~received~~entitled to a part of the lender's fees pursuant to a~~their~~ separate contractual ~~relationship between the lender and Blueacorn~~relationships. *See* THE NEW YORK TIMES, How Two Start-Ups Reaped Billions in Fees on Small Business Relief Loans (June 27, 2021), available at

https://www.nytimes.com/2021/06/27/business/ppp-relief-loans-blueacorn-womply.html (last accessed Sept. 17, 2021).

**Defendants' Exploit PPP Lending**

77.      Before becoming a PPP lender, Capital Plus was a small, regional lender whose total revenue from operations for the fiscal year ending October 31, 2020 was $36.6 million.

~~52.~~78.  At the direction and under the control of its corporate parent Crossroads, CPF exploited the increased fees to be paid by the SBA on smaller PPP loans in 2021 by reportedly agreeing to fund 472,036 PPP loans totaling over $7.5 billion in loan proceeds -- again the second highest number of loans by any lender in 2021, and more loans than Bank of America, PNC Bank, TD Bank and Wells Fargo combined. *See* SBA, Paycheck Protection Program (PPP) Report, Approvals through 5/31/2021, p. 7, available at https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf (last accessed Sept. 17, 2021).

~~53.~~79.  As a result, *Crossroads* (not CPF) publicly reported that it "earned fees from the [PPP] totaling approximately $930 million" according to its quarterly report filed with the SEC for the period ending July 31, 2021. *See* http://www.crossroads.com/wp-content/uploads/2021/09/CRSS_Q3-2021-OTC-Disclosure-Statement.pdf (accessed Dec. 23, 2021).

80.      On June 14, 2021, Crossroads released its consolidated financial results for the second quarter of 2021, ending April 30, 2021. Crossroads disclosed that its "[g]ross origination fees associated with PPP loans totaled $464.1 million for the quarter," and that Crossroads "[e]xpects to accrue a total of $1.1 billion in deferred gross origination fees from the [PPP]." It

also disclosed that as of April 30, 2021, Crossroads "held a cash balance of $213.1 million compared to $2.6 million as of October 31, 2020."

81.     The June 14, 2021 release of its financial results also states as follows (emphasis added):

> In the last several months, Capital Plus has transformed from a regional single-family mortgage-based lending institution into ***one of the country's largest providers of small business loans***," said Eric A. Donnelly, Chief Executive Officer of Crossroads Systems. When the SBA announced its reopening of the program in January, we immediately identified strong synergies between the program's focus on small businesses and Capital Plus's core mission as a CDFI. Together with our loan service providers, we established early incumbency as the go-to institution for small business owners, independent contractors, and sole proprietors. Financially, our success in the program has put us into the ***best position we have ever been in, netting us more than $150 million in operating income for the quarter. At a record cash position***, we are well-capitalized to support the future growth initiatives that will drive our double bottom line. We will provide a more detailed review of the quarter and these growth initiatives in the near future upon the completion of PPP." (emphasis added).

82.     In a July 8, 2021 letter to Crossroads' shareholders, Donnelly again touted the success of its exploitation of PPP lending via its control and domination over its SBA-qualified PPP lending subsidiary CPF, stating as follows:

> "Within just five months, we have approved 472,036 loans at an average amount of $16,062. In total, this amounts to …. As a result of our early dominance in PPP lending, Capital Plus was ranked the fourth largest PPP lender by net dollar amount and the second largest by the number of loans approved."

83.     **According to a July 2021 investor presentation, corporate insiders of Crossroads own (or then owned) approximately 66% of Crossroads' equity including specifically as follows: Robert Alpert ("Alpert"), Chairman of the Board of Crossroads and principal of 210/CRDS Investment LLC, 1,492,285 shares, or 25% of Crossroad's total outstanding shares;** ~~Eric~~ **Donnelly** ~~("Donnelly"),,~~ **CEO** and board member of ~~both~~ **Crossroads and** also CEO of **CPF** until August 30, 2021, **2,255,677 shares, or 37.8% of Crossroad's total outstanding shares; and**

Farzana Giga ("Giga"), whose declaration Defendants filed with their motion to dismiss (ECF 24-1), CFO of both Crossroads and CPF and director of Crossroads, and Crossroads board members James Perez Foster, Claire Gogel, Ray Kembel and Clark C. Webb ("Webb"), 194,440 shares, or 3.3% of Crossroad's total outstanding shares. *See* http://www.crossroads.com/wp-content/uploads/2021/01/Crossroads-CRSS-Investor-Presentation_2021.pdf.

54.84.  Thus, in sum, the corporate insiders and directors of Crossroads owned 3,942,402 shares, or approximately 66%, of the 6,171,984 total outstanding shares as of July 2021. *Id.*, with Albert and Donnelly together owning approximately 62.8%. *Id.*

55.85.  On July 8, 2021 —- following its receipt of hundreds of millions of dollars in PPP loan fees, including for Plaintiff'sPlaintiffs and numerous other class member PPP loans CPF failed to actually fund —- Crossroads announced in a letter to shareholders that, based on its "windfall associated with the PPP loan program" it was "now overcapitalized" and would pay out a special dividend of $40 per share to its shareholders on July 26, 2021. *See* http://www.crossroads.com/wp-content/uploads/2021/07/CRSS-FQ2-2021-Shareholder-Letter.pdf (at p. 4).

56.86.  On July 15, 2021, Crossroads issued a news release stating the special dividend of $40 per share wouldwill be payable on July 26, 2021 to stockholders of record at the close of business on July 19, 2021, and that the total amount of the dividend would be approximately $238.9 million based on the number of Crossroads shares outstanding. *See* https://crossroads.mediaroom.com/2021-07-15-Crossroads-Systems-Provides-Additional-Information-on-Special-Dividend?pagetemplate=widgetpopup&printable.

57.87.  As a result, and based on the respective equity interests in Crossroads, Chairman Alpert received $59,691,400 in cash from the special dividend; Crossroads's and CPF's then-

dual CEO Donnelly received $90,227,080; and Alpert, Donnelly and other corporate insiders and directors collectively received $157,696,080 of the approximately $238.9 million total special dividend.

58.88.  On December 14, 2021, Crossroads issued a news release reporting its fiscal year 2021 financial results. In that news release, Crossroads stated that its total fiscal year "revenues increased 2,446% to $932.7 million, up from $36.6 million in the comparative 2020 period"; that "[r]emoving PPP impact from the year's operations, total revenues were $34.9 million compared to $36.6 million in 2020"; that "[o]perating income increased 4,127% to $243.4 million, up from $5.8 million in 2020"; that "[t]he substantial increase in operating income was primarily due to origination fees associated with the Company's participation in the PPP loan program"; and that "[c]ash EPS (operating income less income to non-controlling interests) was $36.19, which was a 4,820% increase compared to $0.74 during the same period in 2020." *See* https://www.prnewswire.com/news-releases/crossroads-systems-reports-fiscal-fourth-quarter-and-fiscal-year-2021-financial-results-301443835.html (last accessed December 29, 2021).

59.89.  Crossroads Board Chairman Alpert is also Chairman and Co-CEO of P10 Holdings, Inc., ("P10"), a publicly traded investment firm that provides investment advisory services to Crossroads, and is also headquartered at the same corporate headquarters as Crossroads, 4514 Cole Avenue, Suite 1600, Dallas, Texas 75205. *See* https://www.p10alts.com/team.

60.90.  Crossroads controlled and directed the activities of CPF, and its management even referred to the companies as if they were one specifically in the context of the PPP in public communications to shareholders, among other things. For example, in a letter to shareholders accompanying its fiscal second quarter report to shareholders for the three months ended

April- 30, 2021, Crossroads Board Chair Alpert and Crossroads's *and* CPF's then-dual CEO Donnelly stated that "[w]e were well equipped to lead the charge for the program's second draw as a result of *our* CDFI status" (emphasis added); that "[l]ast quarter we highlighted *our* intention to participate in the second federal PPP program" (emphasis added); that "*we* were able to issue and approve loan applications at an unprecedently rapid pace~~-~~:" (emphasis added); and that, "[w]ithin just five months, *we* have approved 472,036 loans at an average amount of $16,062. In total, this amounts to $7.6 billion in funding, more than 80% of which went directly to companies and independent contractors of color.") (emphasis added). *See* http://www.crossroads.com/wp-content/uploads/2021/07/CRSS-FQ2-2021-Shareholder-Letter.pdf (last accessed December 29, 2021).

61.——In sum, Crossroads participated directly and indirectly in ~~CPF's~~the PPP loan processing through its common management and control and 100% ownership of CPF~~. and~~; exploited CPF's status as an SBA-approved CDFI PPP lender to enrich itself and its corporate insiders ~~by obtaining~~to obtain fees on PPP loans CPF never funded, ~~and PPP loan proceeds from the PPP program.~~

62.91.  ~~Although Crossroads controlled and directed~~including the ~~activities~~PPP loans of ~~CPF as alleged more fully above, in fact CPF (but not Crossroads) was~~Plaintiffs and the ~~qualified SBA-approved supervised lender for purposes~~other putative members of the ~~PPP.~~proposed class; obtained millions of dollars in PPP lender processing fees including on the backs of the unfunded loans of Plaintiffs and the other putative members of the proposed class; and, in turn, improperly enriched itself and its senior leadership from a federally-backed program designed actually to help struggling small minority, women and other business owners whose businesses were struggling amid the COVID-19 pandemic.

24

**CPF's Direct Participation in the**
**PPP Liquidity Facility**

63.92.  To facilitate lending under the SBA's PPP, the Federal Reserve supplied liquidity to CPF and other participating financial institutions through term financing to be secured by the PPP loans. *See* Board of Governors of the Federal Reserve System, Paycheck Protection Program Liquidity Facility (PPPLF), available at https://www.federalreserve.gov/monetarypolicy/ppplf.htm (last accessed Sept. 17, 2021).

64.93.  In particular, the Paycheck Protection Program Liquidity Facility ("PPPLF") was authorized under § 13(3) of the Federal Reserve Act "to facilitate lending by eligible borrowers [*i.e.*, PPP lenders] to small businesses under the [PPP]. … Under the Facility, the Federal Reserve Banks ('Reserve Banks') will lend to eligible borrowers [*i.e.*, PPP lenders] on a non-recourse basis, taking PPP Loans as collateral." *See* Paycheck Protection Program Liquidity Facility Term Sheet, available at https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20210625a1.pdf (last accessed Sept. 17, 2021).

65.94.  Further, "[a]ll lenders that are eligible to originate PPP Loans are eligible to borrow under the Facility." *Id.*

66.95.  For CPF and other qualified CDFI PPP lenders, the lending Federal Reserve Bank was the Federal Reserve Bank of Cleveland. *Id.*

67.96.  Only SBA-guaranteed PPP loans are eligible to serve as collateral for PPPLF advances, and the principal amount advanced under the PPPLF was to be equal to the principal amount of the PPP loan pledged to secure the extension of credit. *Id.*

68.97.  CPF received billions of dollars of advances through the PPPLF as specified more fully below, in addition to other PPP advances.

25

69.98.  In fact, although the PPP application period ended on May 31, 2021 and the life cycle of a PPP loan application should only take a few business days, CPF continued to receive substantial advances through the PPPLF between June 30, 2021 and July 30, 2021, after the deadline for processing loan applications.

70.99.  For example, between July 1, 2021 and July 30, 2021, CPF received at least three PPPLF cash advances each exceeding $30,000,000.00, and also received a total of $134,119,585.79 in PPP loan advances for the month of July 2021 alone.

71.100.        In particular, according to a report by the Federal Reserve to the U.S. Congress dated December 13, 2021 "PPPLF Transaction-specific Disclosures (XLSX)," CPF received the following specific cash advances from the PPPLF:

| Date of Advance | Amount |
|---|---|
| 2021-02-02 | $2,178,040.41 |
| 2021-02-02 | $627,622.00 |
| 2021-02-11 | $5,708,115.06 |
| 2021-02-11 | $273,968.00 |
| 2021-02-11 | $2,710,413.00 |
| 2021-02-11 | $273,579.59 |
| 2021-02-11 | $2,129,648.45 |
| 2021-02-11 | $3,693,488.60 |
| 2021-02-11 | $5,512,672.14 |
| 2021-02-25 | $1,191,862.00 |
| 2021-02-25 | $1,906,418.00 |
| 2021-02-25 | $34,357.00 |
| 2021-02-25 | $1,291,742.00 |
| 2021-02-25 | $2,976,057.35 |
| 2021-02-25 | $541,239.00 |
| 2021-02-25 | $372,863.50 |
| 2021-02-25 | $57,626.00 |
| 2021-03-01 | $354,159.11 |
| 2021-03-01 | $5,647,969.98 |
| 2021-03-02 | $325,669.00 |
| 2021-03-02 | $4,378,004.32 |
| 2021-03-02 | $1,460,686.27 |
| 2021-03-02 | $182,176.50 |

| **Date of Advance** | **Amount** |
|---|---|
| 2021-03-02 | $215,785.00 |
| 2021-03-02 | $10,184,988.00 |
| 2021-03-02 | $586,175.75 |
| 2021-03-03 | $452,683.05 |
| 2021-03-03 | $2,161,402.00 |
| 2021-03-04 | $5,273,526.10 |
| 2021-03-09 | $5,825,425.32 |
| 2021-03-09 | $5,502,974.02 |
| 2021-03-09 | $791,045.97 |
| 2021-03-09 | $7,966,408.33 |
| 2021-03-10 | $4,144,182.85 |
| 2021-03-11 | $3,279,707.66 |
| 2021-03-15 | $22,298,842.23 |
| 2021-03-16 | $764,647.00 |
| 2021-03-16 | $17,845,001.09 |
| 2021-03-16 | $902,196.50 |
| 2021-03-16 | $1,794,125.60 |
| 2021-03-17 | $19,604,711.14 |
| 2021-03-18 | $14,608,755.33 |
| 2021-03-18 | $1,091,038.95 |
| 2021-03-19 | $12,415,131.15 |
| 2021-03-22 | $82,131,881.16 |
| 2021-03-23 | $54,386,988.50 |
| 2021-03-23 | $ 16,861,162.00 |
| 2021-03-23 | $27,003,647.85 |
| 2021-03-24 | $98,770,508.82 |
| 2021-03-25 | $10,147,992.90 |
| 2021-03-29 | $479,593.40 |
| 2021-03-29 | $6,760,457.63 |
| 2021-03-29 | $11,671,507.38 |
| 2021-03-29 | $11,310,627.52 |
| 2021-03-29 | $8,987,367.00 |
| 2021-03-29 | $8,840,001.43 |
| 2021-03-29 | $8,036,480.35 |
| 2021-03-29 | $7,579,378.00 |
| 2021-03-29 | $7,687,847.70 |
| 2021-03-29 | $5,476,010.00 |
| 2021-03-29 | $3,022,105.50 |
| 2021-03-29 | $2,097,367.75 |
| 2021-03-29 | $7,343,229.25 |
| 2021-03-29 | $5,352,732.72 |

27

| Date of Advance | Amount |
| --- | --- |
| 2021-03-29 | $3,907,229.00 |
| 2021-03-29 | $3,074,780.48 |
| 2021-03-29 | $2,324,503.09 |
| 2021-03-29 | $947,087.00 |
| 2021-03-29 | $2,505,979.50 |
| 2021-03-29 | $1,170,854.10 |
| 2021-03-29 | $4,357,560.50 |
| 2021-03-30 | $79,562,983.00 |
| 2021-03-30 | $102,496,216.00 |
| 2021-03-30 | $72,574,056.00 |
| 2021-03-30 | $84,507,665.00 |
| 2021-03-31 | $75,764,259.00 |
| 2021-04-01 | $9,549,671.89 |
| 2021-04-01 | $39,612,141.00 |
| 2021-04-02 | $243,075,429.00 |
| 2021-04-06 | $257,472,124.33 |
| 2021-04-06 | $132,444,399.00 |
| 2021-04-07 | $10,927,697.00 |
| 2021-04-07 | $62,021,483.00 |
| 2021-04-08 | $85,339,435.12 |
| 2021-04-08 | $259,374,000.00 |
| 2021-04-16 | $126,501,443.00 |
| 2021-04-16 | $181,211,831.00 |
| 2021-04-16 | $162,256,760.73 |
| 2021-04-16 | $16,005,416.00 |
| 2021-04-16 | $176,063,638.00 |
| 2021-04-20 | $15,295,725.00 |
| 2021-04-21 | $12,171,969.60 |
| 2021-04-21 | $5,953,438.16 |
| 2021-04-21 | $38,643,341.00 |
| 2021-04-21 | $96,987,237.00 |
| 2021-04-21 | $48,105,810.00 |
| 2021-04-23 | $58,507,134.00 |
| 2021-04-23 | $368,780,681.00 |
| 2021-04-23 | $327,135,009.82 |
| 2021-04-23 | $70,865,658.00 |
| 2021-04-26 | $114,086,044.00 |
| 2021-04-30 | $5,717,971.00 |
| 2021-05-03 | $1,765,216.00 |
| 2021-05-03 | $2,944,483.47 |
| 2021-05-03 | $2,096,650.00 |

| Date of Advance | Amount |
|:---:|:---:|
| 2021-05-04 | $2,293,625.00 |
| 2021-05-04 | $34,802,766.00 |
| 2021-05-06 | $2,125,832.00 |
| 2021-05-06 | $1,070,106.00 |
| 2021-05-06 | $616,115.00 |
| 2021-05-06 | $835,290.00 |
| 2021-05-07 | $365,435.00 |
| 2021-05-12 | $263,080,394.00 |
| 2021-05-12 | $33,579,305.00 |
| 2021-05-12 | $16,088,836.00 |
| 2021-05-12 | $5,443,630.00 |
| 2021-05-12 | $890,741.00 |
| 2021-05-12 | $1,413,197.00 |
| 2021-05-17 | $1,851,188.00 |
| 2021-05-17 | $1,577,688.00 |
| 2021-05-17 | $1,581,021.00 |
| 2021-05-17 | $8,630,450.25 |
| 2021-05-18 | $1,101,950.00 |
| 2021-05-18 | $577,710.00 |
| 2021-05-18 | $535,369,687.12 |
| 2021-05-20 | $33,419,154.94 |
| 2021-05-20 | $46,027,570.00 |
| 2021-05-24 | $11,859,766.00 |
| 2021-05-25 | $9,886,972.00 |
| 2021-05-25 | $2,365,516.00 |
| 2021-05-25 | $600,024.00 |
| 2021-05-25 | $1,831,023.00 |
| 2021-05-28 | $1,902,346.00 |
| 2021-05-28 | $5,249,415.00 |
| 2021-05-28 | $1,677,600.00 |
| 2021-06-02 | $2,478,525.99 |
| 2021-06-02 | $395,067.00 |
| 2021-06-02 | $574,919.00 |
| 2021-06-04 | $2,086,894.92 |
| 2021-06-04 | $834,823.00 |
| 2021-06-04 | $1,120,999.32 |
| 2021-06-04 | $80,299,469.78 |
| 2021-06-04 | $147,886,129.00 |
| 2021-06-10 | $1,805,560.00 |
| 2021-06-10 | $700,921.00 |
| 2021-06-10 | $1,143,936.00 |

| Date of Advance | Amount |
|:---:|:---:|
| 2021-06-10 | $12,226,237.00 |
| 2021-06-10 | $968,115.00 |
| 2021-06-16 | $1,729,026.00 |
| 2021-06-16 | $933,469.00 |
| 2021-06-16 | $46,130,527.00 |
| 2021-06-17 | $484,266.07 |
| 2021-06-17 | $542,102.00 |
| 2021-06-17 | $807,337.00 |
| 2021-06-18 | $49,044,789.00 |
| 2021-06-22 | $16,783,373.00 |
| 2021-06-23 | $515,136,782.00 |
| 2021-06-23 | $312,406,138.00 |
| 2021-06-24 | $8,087,276.00 |
| 2021-06-24 | $15,750,200.00 |
| 2021-06-24 | $23,444,948.00 |
| 2021-06-25 | $1,627,318.00 |
| 2021-06-25 | $1,400,035.00 |
| 2021-06-25 | $2,004,933.00 |
| 2021-06-25 | $1,331,199.00 |
| 2021-06-25 | $1,303,819.32 |
| 2021-06-25 | $149,773.00 |
| 2021-06-29 | $2,496,951.63 |
| 2021-06-29 | $538,849.00 |
| 2021-06-29 | $41,636.00 |
| 2021-06-29 | $126,344.00 |
| 2021-06-29 | $1,119,986.00 |
| 2021-06-29 | $179,504.00 |
| 2021-06-29 | $244,511.00 |
| 2021-06-29 | $26,324.00 |
| 2021-06-29 | $127,795.00 |
| 2021-06-29 | $144,425.00 |
| 2021-06-29 | $39,294.00 |
| 2021-06-29 | $114,014.00 |
| 2021-06-29 | $5,000.00 |
| 2021-06-29 | $1,140,000.00 |
| 2021-06-29 | $7,642,798.00 |
| 2021-06-29 | $101,233,693.33 |
| 2021-06-30 | $194,761.00 |
| 2021-07-01 | $35,891,616.00 |
| 2021-07-01 | $217,926.00 |
| 2021-07-01 | $436,360.00 |

| Date of Advance | Amount |
|:---:|:---:|
| 2021-07-06 | $38,610,016.00 |
| 2021-07-06 | $1,025,508.00 |
| 2021-07-06 | $62,496.00 |
| 2021-07-07 | $7,098,589.00 |
| 2021-07-13 | $1,219,924.00 |
| 2021-07-13 | $452,164.00 |
| 2021-07-14 | $385,525.00 |
| 2021-07-14 | $41,193,415.00 |
| 2021-07-29 | $239,725.00 |
| 2021-07-30 | $72,735.00 |
| 2021-07-30 | $6,304,677.00 |
| 2021-07-30 | $858,609.79 |
| 2021-07-30 | $32,930.00 |
| 2021-07-30 | $17,370.00 |
| *Total* | $6,458,857,759.43 |

*See* Board of Governors of the Federal Reserve System, Paycheck Protection Program Liquidity Facility (PPPLF), available at https://www.federalreserve.gov/monetarypolicy/ppplf.htm (last accessed Dec. 23, 2021).

72.101.        As alleged below, while CPF reportedly received over $6.4 billion from the PPPLF in 2021 alone, CPF failed to actually fund PPP loans approved by the SBA for PlaintiffPlaintiffs and numerous other SBA-approved borrower members of the proposed class. CPF failed to fund class member approved loans, moreover, despite having actually received the unfunded PPP loan proceeds via advances from the PPPLF. secured by the PPP loans, including the PPP loans it failed to fund.

102.     Although no discovery has occurred yet in this case, emails produced in Womply's litigation against Defendants reflect Defendants knew of CPF's failure to fund SBA-approved PPP loans. For example, one such unfunded borrower wrote an email to Christopher Dalton ("Dalton") of the SBA on June 24, 2021 stating as follows:

31

"Hi Christopher, This is Minority women own small business for 14 years Covid 19 destroyed my business . SBA approved ppp loan . I email to Ms .Faranza giga capital plus , I got respond from Greg Jacobson i give him my information still no respond . 'I NEED HELP.' My lender is Capital Plus My loan no is . First draw ppp loan . Amount of loan is not big but for me is really helpful to restart my business . Thank you,"

Dalton forwarded that email to Donnelly and CPF employee Greg Jacobson ("Jacobson") on June 25, 2021 and Jacobson, in turn, forwarded it to representatives of Womply also on June 25, 2021, stating "please see below a request for status from the SBA" and "also confirm all else is getting funded ...." Another email dated June 18, 2021 by CPF's CFO Farzana Giga to Connie Spencer-Adams of Womply stated as follows: "Any loans not sent to BA/CPF by 6/23 will not be able to get funds and none of us want to deal with that."

103.    Furthermore, Defendants cite totally distinguishable cases involving *prospective* PPP loan applicants rather than, as here, SBA-*approved* borrowers, *delayed* PPP loan payments, and PPP loan processing fee "agent" cases (ECF 25 at ECF pp's 10-11), and then glibly and callously assert that "Plaintiff's misleading claim in this case, that CPF 'failed to fund' a loan it agreed to make, suggests that litigants seeking to exploit the PPP for private gain are simply running out of ideas." *Id.* at ECF p. 11. In truth, Plaintiffs -- who are small business owners involved, respectively, in insurance inspection, auto repair, landscaping and support for artists and writers -- are among the very intended beneficiaries that Congress designed the PPP to assist and CPF was contractually obligated but failed to fund.

### CPF's Failure to Fund
### Plaintiff Greathouse's PPP Loan

~~73.~~104.    When the pandemic began, Plaintiff Greathouse was, and continues to be, in the business of providing insurance inspection services in the Russellville, Arkansas area.

~~74.~~105.        Due to the pandemic, Plaintiff was not able to provide these services with the same frequency and, as a result, lost significant income.

~~75.~~106.        On or about April 8, 2021, Greathouse applied for a PPP loan with CPF. Greathouse submitted all requested documentation and information.

~~76.~~107.        On or about April 9, 2021, the SBA approved Greathouse's PPP loan application and assigned it a loan number (SBA Loan Number 9988328700).

~~77.~~108.        ~~The SBA approved~~ Greathouse was approved for a PPP loan in the amount of $15,665.00.

~~78.~~109.        On April 18, 2021, Greathouse received the standard form PPP promissory note (the "Note") and accompanying documents for him to sign.

~~79.~~110.        The Note identified the SBA loan number and amount, Defendant CPF as the lender and Plaintiff Greathouse as the borrower; set forth payment terms, potential events of default, CPF's rights in the event of default, and other terms and conditions; and provided the terms for Plaintiff Greathouse to repay the loan to CPF if it was not forgiven.

~~80.~~111.        The Note also included ~~an~~a standard form Additional and Correction Documents Agreement (Errors and Omissions Agreement) between CPF and Plaintiff Greathouse; a Business Purpose Statement; a Notice - No Oral Agreements bearing the signature ~~of~~CPF Chief Financial Officer Giga and Plaintiff Greathouse; a Written Consent of Governing Body form for Greathouse to represent that he is authorized to receive the loan and on which CPF may rely; an IRS W-9 Request for Taxpayer Identification Number and Certification; and an Information and Bank Account Certification and Authorization form identifying the bank or other account to which CPF was obligated to send the funds (collectively, the "Loan Documents").

33

81.112.		On April 18, 2021, Greathouse signed and returned the Loan Documents in order to obtain the $15,665.00 PPP loan.

82.113.		Also on April 18, 2021, Greathouse was advised by email that his loan was approved and would beis being funded.

83.114.		Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Greathouse never received the proceeds of his SBA-approved PPP loan.

84.115.		For example, Greathouse contacted and consulted with his local SBA office about CPF's failure to fund his PPP loan, and sent emails and made numerous telephone calls to CPF and Blueacorn to try to follow-up and get funded, all to no avail.

85.116.		On July 19, 2021, and following his complaints to the local SBA office and telephone calls again seeking funding, Greathouse was advised on July 19, 2021 that his PPP loan was being funded within an estimated three to six days.

86.117.		Although the SBA's records reported that Greathouse's PPP loan had actually been funded, Greathouse never received any PPP loan proceeds.

87.118.		The SBA's record of the alleged disbursement of Greathouse's loan proceeds was based on data CPF provided to the SBA.

88.119.		CPF's failure to fund Greathouse's SBA-approved PPP loan deprived Greathouse of funds that would have directly assisted in the operation of his inspection business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund**
**Plaintiff Covarrubias's PPP Loan**

120.    When the pandemic began, plaintiff Covarrubias was, and continues to be, in the business of providing auto repair services in the Santee, California area.

121.    Due to the pandemic, plaintiff Covarrubias's business lost significant income.

122.    In or about May 2021, Covarrubias applied for a PPP loan with CPF. Covarrubias submitted all requested documentation and information.

123.    In May 2021, the SBA approved Covarrubias's PPP loan application and assigned it a loan number (SBA Loan Number 4713608906).

124.    Covarrubias was approved for a PPP loan in the amount of $8,332.00.

125.    On May 21, 2021, Covarrubias received the same standard form PPP promissory Note and accompanying standard form Loan Documents for him to sign that plaintiff Greathouse also received and signed.

126.    On May 21, 2021, Covarrubias signed and returned the Loan Documents in order to obtain the $8,332.00 PPP loan.

127.    Also on May 21, 2021, Covarrubias was advised by email that his loan was approved and is being funded.

128.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Covarrubias never received the proceeds of his SBA-approved PPP loan. Covarrubias attempted to contact CPF directly to get his loan funded, but was unable to reach anyone live with whom to speak. As he stated in a December 8, 2021 email to an SBA representative, there was a "lack of customer service and being able to get ahold of a live person being nonexistent made things worse."

35

129.    Covarrubias also contacted the SBA directly about CPF's failure to fund his PPP loan, and sent emails and made numerous telephone calls to CPF and SBA to try to follow-up and get funded, all to no avail.

130.    For example, Covarrubias sent an email to a SBA representative on November 29, 2021 stating "If the loan had been canceled and return why was I able to get approved for my loan to be forgiven. Someone kept that money knowing that if I didn't get my loan forgiven I would be on the hook for paying it back. I would've been out of time to apply for the loan to be forgiven [] I would've been responsible for paying loan back if the loan was still in limbo." The SBA representative replied to him that same day by email stating "I understand this has happened to a lot of individuals, but therefore the SBA is program -- the bank utilize [sic] just like a mortgage done by Fanny/Freddie. Yes, it is backed by a Government program, but it is managed and held with a bank or lending institution. We don't approve, deny, or withdraw any requests, because they are not our loans."

131.    Similarly, in a September 29, 2021 email Covarrubias sent to the Blueacorn portal after Blueacorn refused to assist in getting CPF to fund his loan, Covarrubias sought further information regarding the whereabouts of the PPP loan proceeds he was approved by the SBA to receive, and which SBA records falsely showed were disbursed to him and as to which he was obligated to repay plus interest:

> "First and foremost those documents I originally sent in where prove enough for the SBA to approve my loan and give me a loan number. Second had my loan been denied I wouldn't of received an email reminding me about the loan forgiveness. Why haven't I received an email from you or my lender telling me to get my loan forgiven. I know why because than you would be committing a fraud. What your trying to do is wait everyone out until the very last minute who has $8332 just laying around to pay the loan back when it could all just go away with the loan forgiveness, oh but wait what happens to the $8332 dollars of mine that the SBA approved who gets that money. Well that money who knows where it went it just disappeared it vanished along with thousands of other people's PPP

loans that BLUE ACORN AND CAPITAL PLUS FINANCIAL HAVE STOLEN LIED ABOUT BEING DISBURSED. I NEVER RECEIVED NOT ONE PHONE CALL FROM EITHER BLUE ACORN OR CAPITAL PLUS FINANCIAL." (emphasis in original)

132.    Covarrubias still persisted in his efforts to actually get his SBA-approved loan funded.

133.    Although the SBA's records reported that Covarrubias's PPP loan had actually been funded, Covarrubias never received any PPP loan proceeds.

134.    The SBA's record of the alleged disbursement of Covarrubias's loan proceeds was based on data CPF provided to the SBA.

135.    CPF's failure to fund Covarrubias's SBA-approved PPP loan deprived Covarrubias of funds that would have directly assisted in the operation of his business and resulted in lost opportunities and other consequential damages.

### CPF's Failure to Fund
### Plaintiff Sumrall's PPP Loan

136.    When the pandemic began, plaintiff Sumrall was, and continues to be, in the business of providing landscape architectural services in the El Paso, Texas area.

137.    Due to the pandemic, plaintiff Sumrall was not able to provide these services with the same frequency and, as a result, lost significant income.

138.    On or about May 18, 2021, Sumrall applied for a PPP loan with CPF. Sumrall submitted all requested documentation and information.

139.    In May 2021, the SBA approved Sumrall's PPP loan application and assigned it a loan number (SBA Loan Number 5126489010).

140.    Sumrall was approved for a PPP loan in the amount of $4,095.00.

141.    Also in May 2021, Sumrall received the same standard form Note and accompanying Loan Documents for her to sign that plaintiff Greathouse received, and Sumrall signed and returned the Loan Documents in order to obtain the $4,095.00 PPP loan.

142.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Sumrall never received the proceeds of her SBA-approved PPP loan.

143.    For example, Sumrall contacted the Blueacorn for any information it had about CPF's obligation to fund her loan and, by email on May 29, 2021, was told that "[i]f your application is SBA approved, you can be rest assured that your funds are secure and they will be transferred to your account." Sumrall replied as follows:

> "I understand you may be very busy but I have lost 2 people to COVID my business home and family a on the brink. There has been no light in sight. I have passed every identity verification process. I never once stated anything about fraud. Please explain why I was approved and signed your promissory note and have no money and now this. Please explain."

144.    Although the SBA's records reported that Sumrall's PPP loan had actually been funded, Sumrall never received any PPP loan proceeds.

145.    The SBA's record of the alleged disbursement of Sumrall's loan proceeds was based on data CPF provided to the SBA.

146.    CPF's failure to fund Sumrall's SBA-approved PPP loan deprived Sumrall of funds that would have directly assisted in the operation of her business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund
Plaintiff Myles's PPP Loan**

147.    When the pandemic began, plaintiff Myles was, and continues to be, in the business of providing services to independent artists, writers and performers in the Raeford, North Carolina area.

148.    Due to the pandemic, plaintiff Myles's business was damaged and, as a result, lost significant income.

149.    In or about May 2021, Myles applied for a PPP loan with CPF.

150.    Also in May 2021, the SBA approved Myles's PPP loan application and assigned it a loan number (SBA Loan Number 5742309006).

151.    Myles was approved for a PPP loan in the amount of $11,497.00.

152.    In May 2021, Myles received and properly signed and returned the same standard form Note and accompanying Loan Documents that plaintiff Greathouse received.

153.    Despite properly and timely completing, signing and submitting the Loan Documents and additional attempts to obtain the loan proceeds, however, Myles never received the proceeds of her SBA-approved PPP loan.

154.    For example, in an email on August 11, 2021, Myles summarized her experience as follows:

> "I also can show text messages beginning in 10/2019 until this year. I began proceedings for this singing competition in October 2019, communicated with the Director at Cole Auditorium in February 2020. I have the messages. Also, if you requested all of the information that you stated I did not present to you, I would like to know when, how, and a completed copy of what you were requesting. I was never to start the business because of the pandemic so there wasn't any taxes to file, no revenue, nothing. And finally, if you needed all of the documentation that you claim I did not submit, why was I ever approved and sent a check to my bank account?

I will expect answers, I will not allow you all to treat me this way, and I will fight for my right to have the check that was sent to me, returned. My account had not been negative for a long time, but because I was informed that I had been approved, I went in debt to open a business bank account, pay over $2000 for a website, and many meetings.

I want the funds I was approved for returned to me or we will be in the news. And don't say I am threatening you because I am not.... this is a promise. You will not give and then take back, and think you're going to get away with it."

155.    Although the SBA's records reported that Myles's PPP loan had actually been funded, Myles never received any PPP loan proceeds.

156.    The SBA's record of the alleged disbursement of Myles's loan proceeds was based on data CPF provided to the SBA.

157.    CPF's failure to fund Myles's SBA-approved PPP loan deprived Myles of funds that would have directly assisted in the operation of her business and resulted in lost opportunities and other consequential damages.

**CPF's Failure to Fund Other**
**SBA-Approved Class Member**
**Borrower PPP Loans**

89.    ~~Other similarly situated borrowers have been damaged by CPF's failure to fund their SBA-approved PPP loans and have complained about their experiences in social media sites.~~

90.    ~~For example, publicly-posted complaints by other consumers on the internet tell similar stories:~~

158.    Again while Defendants contend that "CPF is committed to its borrowers' satisfaction" and that "the vast majority of CPF's borrowers have reported no issues receiving their loans" (ECF 25 at ECF p. 9), the truth is that, in addition to Plaintiffs' experiences, numerous other PPP borrowers across the United States have complained publicly about CPF's failure to fund their PPP loans, examples of which include the following:

a.   "Capital Plus Financial has kept hundreds of people's PPP loans that were already approved by the SBA." (Consumer Financial Protection Bureau Complaint Database, Complaint No. 4409176, May 26, 2021, https://www.consumerfinance.gov/data-research/consumer-complaints/, last accessed Dec. 23, 2021);

b.   "I hope capital plus financial is shut down after this, and that's on god. They deserve to lose all of their financial accreditations and business licenses. I have never in my life been in a situation like this with a financial institution that cuts off all methods of contact/communication for months at a time with zero explanation." (Consumer complaint, June 2020, https://www.reddit.com/r/Blueacorn/comments/nci8lm/just_got_off_the_phone_w ith_an_sba_rep_in_tx/, last accessed Dec. 23, 2021);

c.   "[T] they don't have a ETA on when my funds will be sent to my account. They do not have a phone to contact them, the lender Capital Plus Financial doesn't have a way for me to contact. I have emailed the CEO of capital plus financial every single day which is the lender and I have not heard anything from them at all." (Consumer Financial Protection Bureau Complaint Database, Complaint No. 4348481, May 4, 2021, https://www.consumerfinance.gov/data-research/consumer-complaints/, last accessed Dec. 23, 2021);

d.   "I signed on April 8th and it says that my friends have been transferred or deposited and I have not seen a dime has anybody reported this to the SBA?" (June 2021 Consumer Complaint, https://www.reddit.com/r/PPPLoans/comments/ms0pzr/anybody_been_funded_by _capital_plus_financial/gz92tah/?utm_source=reddit&utm_medium=web2x&cont ext=3, last accessed Dec. 23, 2021);

e.   "If they broke they really need to just say that and send me to another lender or something because at this point they owe me." (Consumer complaint, May 2021, Facebook Group PPP Funding Group, https://www.facebook.com/groups/442306946857529/posts/456065148815042, last accessed Dec. 23, 2021);

f.   "They are making up the rules as they go, holding money that doesn't belong to them. This is not what SBA intended." (Consumer complaint June 2021, change.org, https://www.change.org/p/ppp-fraud-by-blueacorn-and-capital-plus-financial-failure-to-deliver-sba-funds?utm_source=share_petition&utm_medium=custom_url&recruited_by_id=9 da43a80-c0d6-012f-2f2f-4040496dcccb, last accessed Dec. 23, 2021); and

g.   "Other delay tactics are mistakes on bank account information you ~~didn't~~didn't make, an inability to correct mistakes you did make and an inability to reach anyone at both companies. They are holding funds and not delivering money to borrowers. SBA tells you to resolve with a lender you ~~can't~~can't reach directly

and never returns calls." (Change.org Petition: *Report PPP fraud by Bluecorn and Capital Plus Financial Failure to Deliver SBA Funds*, 147 supporters, last accessed Dec. 23, 2021).

91.159.        ~~CPF has~~Indeed, Defendants have reportedly received <u>so </u>many complaints about ~~its~~CPF's failure to fund SBA-approved PPP loans. ~~In fact, CPF states~~ that they actually had to add a warning to CPF's website about communications to CPF regarding PPP lending which stated as follows ~~on its website~~:

## NOTICE CONCERNING THREATENING OR HARASSING COMMUNICATIONS

The partnership of Capital Plus Financial and Blue Acorn has successfully served hundreds of thousands of individuals and small businesses through the funding of Paycheck Protection Program (PPP) loans.

Feedback from customers is always appreciated. Customer service remains our top priority.

However, we will not tolerate any threatening or harassing actions or communications from customers in any form.

Any communication from an applicant we deem threatening, harassing or intimidating will result in the immediate withdrawal of the loan.

Additionally, we will pursue all available criminal and civil legal avenues to defend and protect our companies and our associates. Our team includes former federal agents and prosecutors. We are working closely with federal, state, and local law enforcement to identify and prosecute those who would make threats against our companies or our associates. We will pursue these options to the fullest extent of the law.

*See* https://capitalplusfin.com/home/ (visited Dec. 26, 2021).

92.160.        CPF failed to fund the SBA-approved PPP loans of ~~Plaintiff~~Plaintiffs and other ~~class~~Class member borrowers despite the fact that CPF itself participated in the Program directly also as a beneficiary, having received the PPP loan on April 13, 2020 of reportedly $376,800. *See, e.g.*, Capital Plus Financial LLC in Bedford, TX - SBA PPP Loan Data (Paycheck Protection Program) (federalpay.org) (accessed on Dec. 28, 2021).

**Class Action Allegations**

93.161.        ~~Plaintiff brings~~Plaintiffs bring this action individually and on behalf of the

following national class (the "Class~~"):~~") and subclasses:

**National Class:** All persons and entities in the United States who, in 2021, ~~timely~~
applied for PPP loans with defendant CPF as the lender for whom the SBA
provided an SBA loan number, and who ~~had~~executed and submitted their ~~loans~~
~~approved by the SBA~~ Loan Documents but did not receive the PPP loan proceeds.

**California Subclass:** All persons and entities in California who, in 2021, applied
for PPP loans with defendant CPF as the lender for whom the SBA provided an
SBA loan number, and who executed and submitted their Loan Documents but
did not receive the PPP loan proceeds.

**North Carolina Subclass:** All persons and entities in North Carolina who, in
2021, applied for PPP loans with defendant CPF as the lender for whom the SBA
provided an SBA loan number, and who executed and submitted their Loan
Documents but did not receive the PPP loan proceeds.

94.162.        Excluded from the Class and subclasses are Defendants, any entities in

which Defendants have a controlling interest, Defendants' agents and employees, any Judge to

whom this action is assigned, and any member of such Judge's staff and immediate family.

95.163.        There is a well-defined community of interest among members of the

Class and subclasses, and the disposition of their claims in a single action will benefit the parties

and the Court.

96.164.        The proposed Class ~~meets~~and subclasses meet each applicable

requirement of Fed. R. Civ. P. 23~~(a) and 23(b)(3)~~.

97.165.        ***Numerosity***: While the exact number of members of the Class ~~is~~and

subclasses are unknown at this time and can be determined by appropriate discovery, the Class

and each subclass includes numerous members such that joinder of all members is impracticable

within the meaning of Rule 23(a)(1).

98.166.        *Ascertainability*: Names and addresses of members of the Class and subclasses are available from Defendant CPF's records and potentially other sources including publicly available databases. Notice can be provided to the members of the Class and subclasses through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in class action litigation.

99.167.        *Typicality:* Plaintiff'sPlaintiffs' claims are based on the same facts and legal theories as those of the other members of the Class and subclasses which Plaintiff seeksPlaintiffs seek to represent. PlaintiffPlaintiffs and the members of the Class and subclasses all similarly applied for PPP loans, had their loans approved by the SBA, but did not receive their PPP loan proceeds from CPF despite the parties' loan contracts.

100.168.        *Adequacy*: PlaintiffPlaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiff is an and respective subclasses. Plaintiffs are adequate representativerepresentatives of the Class and respective subclasses as histheir interests align with the interests of the members of the Class. and Plaintiff is and respective subclasses. and Plaintiffs are represented by counsel skilled and experienced in class actions, including financial consumer and other class action litigation.

101.169.        *Superiority:* A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action because the expense and burden of individual litigation makes it economically unfeasible for members of the Class and subclasses to seek to redress their claims other than through a class action; if separate actions were brought by individual members of the Class and subclasses, the resulting duplicity of lawsuits could lead to differing and inconsistent adjudications; and, absent a class action, CPF

44

isDefendants are unlikely to be held accountable for itsCPF`s failure to actually fund all

applicable SBA-approved PPP loans.

102.170.        ***Predominance and Commonality***: Common questions of law and fact

exist and predominate over any questions which affect individual members of the Class. and

subclasses. Common questions of fact and law include, but are not limited to:

a.    whether defendant CPF failed to fund SBA-approved PPP loans to
      PlaintiffPlaintiffs and other members of the Class and subclasses in breach
      of its obligations to actually fund such loans;

b.    whether CPF and Crossroads obtained fees for PPP loans that CPF did not
      disbursemake;

c.    whether CPF's corporate parent, Crossroads, controlled CPF and was
      unjustly enriched by obtaining fees for PPP loans;

d.    whether CPF's failure to fund SBA-approved PPP loans violated the Loan
      Documents it entered into with PlaintiffPlaintiffs and other members of
      the Class and subclasses; and

e.    whether defendant CPF's failure to fund SBA-approved PPP loans and
      Crossroads's receipt of PPP loan fees damaged PlaintiffPlaintiffs and the
      members of the Class and subclasses.

103.171.        Plaintiff reservesPlaintiffs reserve the right to amend the definition of the

Class and subclasses if discovery or further investigation reveals that the definition of the Class

or subclasses should be amended.

### COUNT ONE
### Breach of Contract
### (Against CPF)

104.172.        Plaintiff incorporatesPlaintiffs incorporate the allegations from all

previous paragraphs as if fully set forth herein.

105.173.        This Count is alleged by all Plaintiffs against only defendant CPF.

~~106.~~174.      The standard form promissory Note and accompanying Loan Documents that CPF and the members of the proposed Class entered into are binding, enforceable agreements. Among other provisions, the Note identifies the specific PPP loan, loan number and amount of the loan; specifies that the parties to the Note are, respectively, the Class member borrower and the "Lender" CPF; provides that, "[t]his loan is made pursuant to the PPP"; requires the borrower to pay back the principal of the loan plus interest if the PPP loan is not forgiven; contains other PPP loan repayment terms and events of default and the lender's rights in the event of the borrower's default; and contains general provisions, including specifically that "[a]ll individuals and entities signing this Note are jointly and severally liable[.]"

~~107.~~175.      In addition, the Additional and Correction Documents Agreement (Errors and Omissions Agreement) that accompanies the promissory Note between the Plaintiff class member borrowers and CPF provides additional terms and states, at the outset, explicitly as follows:

> ~~"~~"In consideration of Capital Plus Financial, LLC, located at 2247 Central Drive, Bedford, Texas 76021 (hereinafter called ~~"Lender")"~~'Lender') making the above loan, each of the undersigned, jointly and severally, do hereby agree as follows ~~. . . . . .~~"

~~108.~~176.      The Loan Document contracts entered into by CPF and the putative members of the ~~Plaintiff~~alleged borrower Class also include a "Notice - No Oral Agreements" document that governs the "Loan by Lender, Capital Plus Financial, LLC to Borrower"; identifies each Class member borrower; and is executed by both CPF via its CFO Giga, and each putative Class member borrower.

~~109.~~177.      A complete copy of the Loan Document plaintiff Greathouse agreed to is attached to this Complaint as Exhibit A (with only ~~Plaintiff's~~plaintiff Greathouse's Social Security and bank account numbers redacted).

46

110.178.    Through its agreement to make PPP loans via the Loan Documents and as the counterparty to the Loan Documents, CPF entered into a binding ~~agreement~~agreements with ~~Plaintiff~~Plaintiffs and the members of the proposed Class to fund their respective PPP loans.

111.179.    Further, CPF had an implied duty to act in good faith and in accordance with fair dealing to take all steps necessary to fund ~~Plaintiff's~~Plaintiffs' and the Class members' PPP loans pursuant to the Loan Documents.

~~112.    Plaintiff and the Class members performed all their obligations under the Loan Documents.~~

180.    In addition, CPF and its corporate parent Crossroads also acted consistent with, reaped the benefits of and made numerous representations confirming CPF's agreement to fund Plaintiffs' loans. For example, defendant Crossroads reported that "the Company" made $930 million in PPP loan fees by representing to the SBA that it had funded Plaintiffs' and other PPP loans. Defendant CPF also obtained billions of dollars from the PPPFL by pledging Plaintiffs' and other borrowers' loans as collateral. Defendant CPF could not properly secure PPPLF advances on loans it would not fund. Defendant CPF also consistently reported to the SBA that it had funded class members' loans.

113.181.    Defendant CPF breached its obligations to fund ~~Plaintiff's~~Plaintiffs' and the Class members' PPP loans under the Loan Documents by failing to fund ~~the loans within 10 days of the SBA's approval of the loans and assignment of loan numbers, or at any time thereafter~~their loans.

114.182.    Moreover, all PPP loan applications require applicants to certify that they have not, and will not, receive other PPP loans.

~~115.~~183.        As a result, once ~~Plaintiff~~Plaintiffs and the other members of the Class

applied for PPP loans and their loan applications were approved by the SBA and assigned PPP

loan numbers pursuant to the Loan Documents, ~~Plaintiff~~Plaintiffs and the Class members were

no longer able to apply for PPP loans with other PPP lenders as they would not be able to certify

that they would not receive another PPP loan.

~~116.~~184.        ~~Plaintiff~~Plaintiffs and the Class members were therefore effectively bound

to, and had to rely exclusively on, CPF to actually abide by their Loan Document commitments

to provide them with the PPP loan funds that the SBA had already approved.

~~117.~~185.        As a result, CPF harmed ~~Plaintiff~~Plaintiffs and the members of the Class

in an amount to be determined at trial, but not less than the amount of the wrongfully withheld

PPP loan proceeds plus all other applicable damages to the full extent permissible by law.

**COUNT TWO**
**Breach of Contract**
**(Against Crossroads)**

~~118.~~186.        ~~Plaintiff incorporates~~Plaintiffs incorporate the allegations from all

previous paragraphs as if fully set forth herein.

~~119.~~187.        This Count is alleged by all Plaintiffs against only defendant Crossroads.

~~120.~~188.        As more fully described above, Crossroads exercised substantial control

over CPF, operated with CPF as a single enterprise, held out in its SEC filings and other public

statements that it was one and the same companies, participated in CPF's PPP loan processing

practices, and exploited CPF's status as an SBA-approved CDFI lender to enrich itself and its

corporate insiders through improperly obtained funds.

~~121.~~189.        Crossroads also exercised its control over CPF to cause CPF to

~~forward~~"upstream" to Crossroads hundreds of millions of dollars in PPP-related ~~funds~~loan

48

processing fees and PPPLF loan advances, notwithstanding that CPF had not funded Plaintiff'sPlaintiffs' and Class members' loans on account of which CPF received those funds.

122.190.    UnderAccordingly, Crossroads also breached the Loan Agreement contracts Plaintiffs entered into with CPF because Crossroads controlled the conduct of, and is thus also liable for, CPF's breaches of those contracts. In addition, under the principles of equity and good conscience, Crossroads should not be permitted to retain the funds it received as a result of Plaintiff'sCPF's breaches of contract and Plaintiffs' and Class members' unfunded loans, without having first caused CPF to disburse the Plaintiff's and Class members loans.

123.191.    As a result of the foregoing, Crossroads is liable to PlaintiffPlaintiffs and Class members as CPF's alter ego, for the amount of the wrongfully withheld PPP loan proceeds plus all other applicable damages to the full extent permissible by law.

124.192.    As a result of the foregoing, the corporate veil of CPF should be pierced, and Crossroads should be held liable to Plaintiff andsand Class members for the amount of the wrongfully withheld PPP loan proceeds plus all other applicable damages to the full extent permissible by law.

### COUNT THREE
### Unjust Enrichment
### (Against Both Defendants)

125.193.    Plaintiff incorporatesPlaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

126.194.    Plaintiff allegesAll Plaintiffs allege this Count against both Defendants. Plaintiffs allege this Count only in the alternative, to the extent Plaintiff'sPlaintiffs' breach of contract claims fail to adequately compensate PlaintiffPlaintiffs and Class members for the Defendants' violations as alleged herein.

49

~~127.~~195.        ~~Plaintiff~~Plaintiffs and Class members conferred a monetary benefit on Defendants. Specifically, they chose CPF to process and fund their PPP loans. In exchange, ~~upon approval of their loans, Plaintiff~~Plaintiffs and Class members should have received the funds to which they were entitled.

~~128.~~196.        Defendants received PPPLF advances and PPP loan processing fees based, at least in part, on the unfunded loans of the ~~Plaintiff~~Plaintiffs and Class members.

~~129.~~197.        Defendants appreciated or had knowledge of the benefits they received as a result of the ~~Plaintiff's~~Plaintiffs' and Class members' approved loans and they accepted and retained those benefits. Defendants profited from ~~Plaintiff's~~Plaintiffs' and Class members' ~~business~~PPP loan transactions and used the funds resulting therefrom for business purposes and for the personal gain of Crossroads's shareholders, as alleged more fully above.

~~130.~~198.        Crossroads controlled and directed the activities of CPF for purposes of the PPP also as alleged more fully above, and CPF should have timely and properly funded ~~Plaintiff's~~Plaintiffs' and Class members' PPP loans.

~~131.~~199.        Under the principles of equity and good conscience, Defendants should not be permitted to retain the funds they received as a result of ~~Plaintiff's~~Plaintiffs' and Class members' unfunded loans, without having disbursed those or other funds to fund the loans to which ~~Plaintiff~~Plaintiffs and Class members were entitled.

~~132.~~200.        CPF did not fund those loans, and therefore did not provide full compensation for the benefit ~~Plaintiff~~Plaintiffs and Class members provided.

~~133.~~201.        As a direct and proximate result of Defendants' conduct, ~~Plaintiff~~Plaintiffs and Class members have suffered and will suffer injury.

134.202.     Defendants should not be permitted to unjustly enrich themselves at the expense of PlaintiffPlaintiffs and Class members, but in equity and good conscience should be required to make restitution for all funds acquired as a result of Defendants' unlawful conduct.

135.203.     Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of PlaintiffPlaintiffs and Class members, proceeds that it unjustly received as a result of Plaintiff'sPlaintiffs' and Class members' PPP loans.

### COUNT FOUR
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (Against Both Defendants)

204.   Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

205.   The California Unfair Competition Law ("UCL") defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

206.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

207.   Plaintiff Covarrubias brings this claim individually and on behalf of the California subclass and has standing to bring this claim because he is and at all times relevant was a resident of California and is subject to the protection of the UCL.

208.   CPF's failure to fund SBA-approved PPP loans breached the Loan Documents and accompanying legal duties it owed plaintiff Covarrubias and the other members of the California subclass.

209.   As a result of its failure to fund the SBA-approved PPP loans, CPF obtained fees and other compensation to which it was not entitled, including fees on loans it never funded and

51

loan proceeds rightfully belonging to plaintiff Covarrubias and the California subclass, and wrongfully deprived plaintiff Covarrubias and the members of the California subclass of PPP loan proceeds.

210.    When the PPP loans of plaintiff Covarrubias and the California subclass were approved by the SBA, these SBA-approved borrowers had a vested interest in the PPP loan proceeds which CPF wrongfully withheld.

211.    CPF's failures to fund these PPP loans thereby constitute a violation under the "unlawful" prong of the UCL.

212.    Similarly, CPF's failure to fund SBA-approved loans also constitutes "unfair" acts and practices under the UCL because CPF's acts and practices as alleged offend public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to plaintiff Covarrubias and the members of the California subclass.

213.    CPF's breaches of contract -- including not disbursing SBA-approved loan funds and "locking" these borrowers into CPF -- constitute an unfair practice because those breaches are immoral, unethical, oppressive, unscrupulous, or substantially injurious.

214.    Once the loan applications of plaintiff Covarrubias and other similarly situated members of the California subclass were approved by the SBA, these subclass member borrowers had to rely exclusively on CPF to actually fund their PPP loans and were thereby precluded from seeking PPP loans from other lenders, also as alleged above.

215.    CPF's failure to fund PPP loans of plaintiff Covarrubias and the other members of the California subclass constitute unlawful and unfair business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200.

216.    As a result of CPF's violations of the UCL, plaintiff Covarrubias and the members of the California subclass are, in the alternative and to the extent that their breach of contract claim fails to adequately award their damages for CPF's violations as alleged herein, entitled to equitable relief, including specifically injunctive relief directing CPF to fund their SBA-approved loans in full with applicable interest from the date the loans should have been funded, or restitution for the amount of the wrongfully withheld PPP loan proceeds plus interest.

217.    Defendant Crossroads is liable to plaintiff Covarrubias and the members of the California subclass by virtue of its control of CPF and it being CPF's alter ego and by virtue of its direct participation in PPP lending and both Defendants' violations and failure to fund the SBA-approved PPP loans at issue, all as also alleged more fully above.

**COUNT FIVE**
**North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. Ann. §§ 75-1.1, et seq.**
**(Against Both Defendants)**

218.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

219.    Plaintiff Myles brings this claim individually and on behalf of the North Carolina subclass, and plaintiff Myles has standing to bring this claim because she is and at all times relevant was a resident of North Carolina subject to the protection of the North Carolina Unfair and Deceptive Acts and Practices Act (the "NCUDTPA").

220.    The NCUDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."

221.    Defendants advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by the NCUDPTA. *See* N.C. Gen. Stat. Ann. § 75-1.1(b).

222.    Defendants engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, including:

    a.    Representing to plaintiff Myles and members of the North Carolina subclass their willingness to disburse SBA-approved loans by delivering to plaintiff Myles and members of the North Carolina subclass copies of the Note for their signatures, and accepting the signed Notes; and

    b.    Omitting, suppressing, and concealing the reasons why loans to plaintiff Myles and members of the North Carolina subclass had not been disbursed.

223.    Defendants' conduct constitutes "deceptive acts" in violation of the NCUDTPA.

224.    Defendants' conduct constitutes "unfair acts" in violation of the NCUDTPA.

225.    Defendants' representations and omissions and acts and omissions were material because they were likely to deceive reasonable consumers about their ability to secure SBA-approved loans from defendant CPF, and to preclude plaintiff Myles and other members of the North Carolina subclass from seeking PPP loans from other lenders.

226.    Defendants intended to mislead plaintiff Myles and members of the North Carolina subclass and induce them to rely on their misrepresentations and omissions.

227.    Had CPF which was controlled and dominated at all material times by defendant Crossroads disclosed its intention to withhold the loan proceeds due to plaintiff Myles and members of the North Carolina subclass, plaintiff Myles and the members of the North Carolina subclass would not have done business with CPF. Plaintiff Myles and members of the North Carolina subclass acted reasonably in relying on CPF's misrepresentations and omissions and acts and omissions in failing to fund their PPP loans, the truth of which they could not have discovered before they were contractually bound to CPF, and thereby exclusively reliant upon CPF's good faith in actually funding their SBA-approved PPP loans.

228.    Defendants acted intentionally, knowingly, and maliciously to violate the NDUDTPA, and recklessly disregarded plaintiff Myles' and North Carolina subclass members' rights.

229.    Plaintiff Myles and members of the North Carolina subclass have suffered ascertainable losses of money or property, and monetary and non-monetary damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

230.    Plaintiff Myles and members of the North Carolina subclass seek all monetary and non-monetary relief allowed by law under the NCUDTPA, including actual damages, treble damages, restitution, and attorneys' fees and costs.

### Prayer for Relief

~~Plaintiff~~Plaintiffs, individually and on behalf of the proposed Class and subclasses as applicable, respectfully ~~requests~~request the following relief:

A.    an order certifying the Class and subclasses under Rule 23 of the Federal Rules of Civil Procedure; naming ~~Plaintiff~~Plaintiffs as representative of the proposed national Class; ~~and~~ naming ~~Plaintiff's~~plaintiffs Covarrubias and Myles as representatives of the proposed California and North Carolina subclasses, respectively; and naming Plaintiffs' attorneys as counsel for the Class and subclasses;

B.    judgment in favor of ~~Plaintiff~~Plaintiffs and the Class and subclasses on all applicable counts asserted herein;

C.    an award of compensatory, consequential and other damages to ~~Plaintiff~~Plaintiffs and members of the Class and subclasses in amounts to be determined at trial to the maximum extent permissible by law, plus prejudgment interest;

      D.    an accounting of all PPPLF advances CPF obtained for PPP lending and any other federally-guaranteed proceeds CPF obtained for PPP lending, including the whereabouts of any such proceeds they were not disbursed to SBA-approved borrowers, whether any such proceeds were paid by CPF to Crossroads and/or any other person or entity, the amounts of such payments, the identities of the recipients, and the date such proceeds were paid;

      E.    an accounting of all PPP lender processing fees CPF and/or Crossroads obtained, including for PPP loans it ultimately funded and for PPP loans it did not fund;

      ~~D.~~F.    an order of all other forms of monetary relief to the maximum extent permissible by law, including payment to ~~Plaintiff~~Plaintiffs and the Class and subclasses of all PPP loan proceeds owed and due to ~~Plaintiff~~Plaintiffs and the members of the Class and subclasses with interest, as well as disgorgement of all fees CPF and/or Crossroads obtained in connection therewith to the maximum extent permissible by law;

      ~~E.~~G.    an order requiring that Defendants, in the alternative and to the extent that ~~Plaintiff's~~Plaintiffs' breach of contract claim fails to adequately award ~~Plaintiff~~Plaintiffs and the Class and subclasses their damages for the violations alleged herein, disgorge PPP loan fees and proceeds that they unjustly received and pay into a common fund for the benefit of ~~Plaintiff~~Plaintiffs and the Class and subclasses;

      ~~F.~~H.    an award of punitive damages based on Defendants' intentional, wanton and malicious conduct, or ~~their~~its reckless disregard of ~~Plaintiff's~~Plaintiffs' and the Class members' rights, in amounts to be determined at trial to the maximum extent permissible by law;

      ~~G.~~I.    an order awarding ~~Plaintiff~~Plaintiffs and the Class and subclasses their reasonable attorneys' fees and expenses and costs of this lawsuit, including but not limited to expert fees and costs, to the maximum extent permissible by law; and

H.J.____such other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), ~~Plaintiff demands~~<u>Plaintiffs demand</u> a trial by jury of any and all issues in this action so triable of right.

Dated: March 28, 2022                    Respectfully submitted,

**FRIDAY, ELDREDGE & CLARK, LLP**
Katherine C. Campbell, AR Bar 2013241
Marshall S. Ney, AR Bar 91108
3350 S Pinnacle Hills Pkwy, Suite 301
Rogers, AR  72758
T:  (479) 695-6049
F:  (501) 244-5389
kcampbell@fridayfirm.com
mney@fridayfirm.com

By: _____
    Katherine C. Campbell

**BAILEY & GLASSER LLP**
Lawrence J. Lederer (admitted *pro hac vice*)
Michael L. Murphy (admitted *pro hac vice*)
Bart D. Cohen (admitted *pro hac vice*)
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
T:  (202) 463-2101
F:  (202) 463-2103
llederer@baileyglasser.com
mmurphy@baileyglasser.com
bcohen@baileyglasser.com

**NOLAN HELLER KAUFFMAN LLP**
Justin A. Heller (admitted *pro hac vice*)
Matthew M. Zapala (admitted *pro hac vice*)
80 State Street, 11th Floor
Albany, NY 12207
T:  (518) 449-3300
F:  (518) 432-3123
jheller@nhkllp.com
mzapala@nhkllp.com